FILED
United States Court of Appeals
Tenth Circuit

**June 23, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

MARQUAN TEETZ, as next friend and
personal representative of the Estate of
Cedric Lofton, deceased,

     Plaintiff - Appellee,

v.

JASON STEPIEN; BRENTON NEWBY;
KAREN CONKLIN; WILLIAM
BUCKNER; BENITO MENDOZA,

     Defendants - Appellants,

and

THE BOARD OF COUNTY
COMMISSIONERS OF SEDGWICK
COUNTY, KANSAS, CITY OF
WICHITA; KANSAS; RYAN O'HARE;
JOHN ESAU; JORDAN CLAYTON;
CORY BENNETT; TONY SUPANCIC;
AMANDA DARROW; JOHN KNOLLA,

     Defendants.

No. 24-3153

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:22-CV-01134-EFM)**
_____

Jeffrey M. Kuhlman, Watkins Calcara, CHTD, Great Bend, Kansas, for Defendants-
Appellants.

John S. Marrese, Hart McLaughlin & Eldridge, Chicago, Illinois (Benjamin Stelter-Embry, Embry Law, LLC, Kansas City, Missouri, with him on the brief), for Plaintiff-Appellee.

_____

Before **McHUGH**, **EID**, and **FEDERICO**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

Plaintiff-Appellee Marquan Teetz, as the representative of the estate of his brother, Cedric Lofton, brought this § 1983 action against Defendants-Appellants Jason Stepien, Brenton Newby, Karen Conklin, William Buckner, and Benito Mendoza (collectively, "Defendants"). Mr. Lofton was a juvenile who died while in the custody of the Juvenile Intake Assessment Center ("JIAC") where Defendants worked. Mr. Teetz alleges that Defendants used excessive force when they placed the seventeen-year-old Mr. Lofton—who entered the facility in the throes of a mental health crisis—into a prone restraint for over forty minutes, leading to Mr. Lofton's death from cardiac arrest.

The district court denied Defendants' motion for summary judgment as to Mr. Teetz's excessive force claims because it found disputes of material fact precluded it from determining whether Mr. Lofton had stopped resisting Defendants' attempts to restrain him such that their use of force became constitutionally excessive. In particular, the district court found that surveillance camera footage—which captures portions of the events in question but contains no sound—could support Mr. Teetz's version of events.

2

In this interlocutory appeal, Defendants argue first that the district court's finding of a factual dispute as to whether Mr. Lofton was continually resisting is "blatantly contradicted" by the factual record, and second, that the district court failed to properly analyze whether the law clearly established that Defendants' use of force constituted a constitutional violation.

For the reasons explained below, we disagree and, accordingly, affirm.

## I.    BACKGROUND

As discussed more extensively below, our interlocutory review of the denial of summary judgment based on qualified immunity is generally limited to the purely legal question of whether the facts as found by the district court can show a clearly established constitutional violation. *See, e.g.*, *Est. of Booker v. Gomez*, 745 F.3d 405, 409–10 (10th Cir. 2014). Under a narrow exception to this rule, if "the 'version of events' the district court holds a reasonable jury could credit is 'blatantly contradicted by the record,'" we will look beyond the facts found by the district court. *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Under a separate exception, we have recognized that where "the district court commits *legal* error en route to a *factual* determination," we will review the factual determination on interlocutory appeal. *Pahls v. Thomas*, 718 F.3d 1210, 1232 (10th Cir. 2013). Because Defendants seek to invoke these exceptions, we first recount the facts as found by the district court at summary judgment before separately setting out Defendants' contentions challenging those facts.

### A.    District Court's Factual Findings

Mr. Lofton was a seventeen-year-old child in foster care. On September 23, 2021, his foster father Tanea Randolph drove him to a behavioral health clinic for a mental health evaluation, but Mr. Lofton ran away. After Mr. Lofton returned home, Mr. Randolph called the Kansas Department of Children and Families (the foster care agency) for guidance. The agency advised Mr. Randolph to call the Wichita Police Department ("WPD") and not to let Mr. Lofton back into the home. WPD officers arrived and tried to persuade Mr. Lofton to go to St. Joseph's Hospital, but he refused to comply. The officers observed that Mr. Lofton was hallucinating, acting out of touch with reality, and making several comments about people trying to kill him.

After about forty minutes, a WPD sergeant directed the officers to take Mr. Lofton to St. Joseph's for involuntary hospitalization. Mr. Lofton resisted, a struggle ensued, and eventually the officers placed Mr. Lofton in a restraint device. Because the sergeant determined that Mr. Lofton had committed battery on law enforcement during the struggle, he directed the officers to take Mr. Lofton to the JIAC rather than St. Joseph's. JIAC facilitates the booking process for juveniles between the ages of ten and seventeen within Sedgwick County, Kansas. Juveniles sent to JIAC are assessed, "and they are either booked into the [adjoining] Juvenile Detention Facility ("JDF"), released to a parent or guardian, or released to a children's home." App. Vol. XII at 2838.

4

JIAC Corrections Officer Jason Stepien received a call around 2:30 a.m. on September 24 advising him WPD officers were bringing a combative youth.[1] Security footage with no audio from within JIAC captured much of the subsequent events, which unfolded between 2:34 a.m. and 5:46 a.m. At 2:34 a.m., Mr. Lofton arrived at JIAC still in a restraint device, accompanied by several WPD officers who placed him in a holding room. One of the officers informed Mr. Stepien that Mr. Lofton had been "arrested for battering a law enforcement officer, being combative on scene, and because a family member reported that [Mr.] Lofton had used the drug 'K2' in the past month[,] although none of the officers knew whether [Mr.] Lofton had used any drugs that evening." *Id.* at 2839.

Mr. Stepien received a copy of Mr. Lofton's arrest report but skimmed it only for demographic information and did not read the arrest narrative. Mr. Stepien went to the holding room to introduce himself to Mr. Lofton, who asked to be taken out of the restraint. Mr. Stepien asked "if he was going to be calm enough," to which Mr. Lofton responded, "we'll see." *Id.* at 2839–40. Mr. Stepien told the WPD officers that he did not think Mr. Lofton should be taken out of the restraint. At 3:37 a.m., the WPD officers released Mr. Lofton from the restraint device but left him in the holding room.

---

[1] Defendants claimed Mr. Stepien was not provided any additional information about Mr. Lofton. But Mr. Teetz averred that during a post-incident police interview, Mr. Stepien admitted the WPD officers told him they had been called to Mr. Lofton's home "for a mental health evaluation and that [Mr.] Lofton was not oriented to time and place." App. Vol. XII at 2839.

At 4:07 a.m., Mr. Stepien asked one of the WPD officers to answer questions on JIAC's "Officer Release" form before the officers left JIAC. The form indicated any "yes" answers "would require obtaining a medical release for the juvenile before JIAC could accept physical custody." *Id.* at 2840. Although the WPD Officer initially answered affirmatively to some questions, after some back-and-forth, the WPD officer answered "no" to each question—including questions about whether Mr. Lofton exhibited "[s]igns of acute illness" or "[s]igns of intoxication with significant impairment in functioning." *Id.* JIAC accepted temporary physical custody of Mr. Lofton, but WPD retained legal custody of him, meaning only WPD could transport Mr. Lofton away from JIAC for medical treatment. By 4:17 a.m., all WPD officers left JIAC.

The district court described what happened next as follows:

At 4:20 a.m., Stepien released Lofton from the holding room. Lofton then approached JIAC's glass partition, reached under the screen, and started grabbing at a computer monitor. After Stepien told him to stop several times, Lofton stopped and walked away from the partition. Stepien told Lofton that he needed to sit down or else he would have to go back into the holding room. Lofton then approached the partition a second time. As he did so, Stepien entered the lobby.

Stepien asked Lofton to either sit down or go back to the holding room. Lofton only responded by asking Stepien questions like "what would happen if I attack you?" or "do you guys hit people here?" Lofton continued advancing towards Stepien, who tried to back away and maintain distance between himself and Lofton.

Brenton Newby was a Corrections Officer at JDF, which shares a building with JIAC. Around this time, Newby came over from the JDF side to the JIAC side and was standing behind one of the windows at the partition.

At 4:25 a.m., Stepien signaled to Newby to join him in the JIAC lobby. Newby entered the lobby, and he and Stepien continued to try to speak with Lofton and de-escalate Lofton's behavior. Lofton continued to approach

6

them and reached out his arms as if to touch them. Stepien repeatedly asked Lofton to go back to the holding room, but Lofton remained non-compliant.

Around this time, Newby radioed his JDF Corrections Supervisor, Karen Conklin, who was working on the JDF side of the building and asked her to come to his location.

At 4:26 a.m., Stepien and Newby attempted to place Lofton in an over/under escort hold to take Lofton into the holding room. Lofton freed his right arm from the hold and punched Stepien in the face, knocking Stepien's glasses off. At that point, a struggle ensued, and Lofton resisted Stepien and Newby's attempts to move him back to the holding room.

By 4:27 a.m., Conklin and another JDF Corrections Supervisor, William Buckner, arrived at the JIAC lobby to assist. When they arrived, Conklin and Buckner saw Lofton's arms around Newby's neck in a chokehold position. The officers were able to free Newby from Lofton's grasp and attempted to restrain Lofton in a seated position on the concrete bench in the holding room.

While Lofton was in the seated position, Stepien, Conklin, Newby, and Buckner tried to restrain Lofton's limbs to keep him from hitting, kicking, or scratching the officers. All the while, the officers continued their attempts to verbally de-escalate the situation. Lofton repeatedly said things like "I'm going to kill you" or "kill yourself," and referred to himself as Jesus and Satan.

The officers had a difficult time controlling Lofton in the seated position on the bench and determined that it would be safer to move him to the floor. Either before putting him on the floor or shortly after putting him on the floor, the officers applied shackles to Lofton's legs. Once Lofton was lying prone on the floor, Conklin, Newby, Buckner, and Stepien tried to restrain Lofton.

Stepien was kneeling next to and holding Lofton's ankles. Newby was located near Lofton's left arm, and Buckner was located near Lofton's right arm. The holds Newby and Buckner were trying to maintain on Lofton's arms were referred to as S.A.F.E holds. S.A.F.E holds are a technique used to grab the subject's wrist to immobilize him without hurting him. Conklin was kneeling next to Lofton's right hip. Defendants contend that Conklin placed one hand on each of Lofton's hips, but she did not place her weight on Lofton's back. Plaintiff contends that Conklin was laying on top of Lofton's back during the restraint.

7

From approximately 4:34 a.m. to 4:51 a.m., Stepien, Buckner, Conklin, and Newby remained in those relative positions trying to restrain and de-escalate Lofton. Defendant claims that Lofton was fighting and resisting the entire time. Plaintiff contends that Lofton was subdued and largely immobilized.

Relatively early in their restraint of Lofton in the prone position, Newby and Buckner tried to bring Lofton's arms together in an attempt to handcuff him. They ultimately did not handcuff Lofton and threw the handcuffs aside.

Around 4:38 a.m., Conklin radioed for Corrections Officer Zach Hembrick. When Hembrick came to the holding room, Conklin informed him that he was responsible for the other juveniles at JDF because she and Newby were busy with Lofton. After receiving these instructions, he returned to JDF.

Eventually, Buckner told Stepien that they could not continue holding Lofton and suggested that he call WPD to come retrieve Lofton. Conklin radioed for another JDF officer, Benito Mendoza, to come relieve Stepien so that he could leave to call WPD.

At 4:50 a.m., Mendoza arrived at JIAC and took over Stepien's position at Lofton's feet. Stepien left the holding room at 4:51 a.m. and called dispatch to have WPD come back and take Lofton. Between 4:53 and 5:18 a.m., the corrections officers waited for WPD's response for transport.

Around 5:05 a.m., the officers handcuffed Lofton. Defendants contend that not long after the handcuffs were applied, Lofton stopped resisting. Plaintiff argues that Lofton never struggled, resisted, or fought after he was placed in the prone position, which was more than 30 minutes before he was handcuffed.

Shortly after they applied handcuffs, the officers released their holds on Lofton, but Lofton remained prone on the holding room floor. The corrections officers believed he was asleep and snoring. During the struggle, Lofton was bleeding from his nose. So, Buckner and Newby left the holding room at 5:08 a.m. to go to the restroom and clean blood off their arms. Newby's shirt appeared sweaty when he left the room. Conklin, Mendoza, and Stepien stayed in the holding room to monitor Lofton. Lofton remained in his leg shackles and handcuffs while awaiting WPD's transport.

Conklin watched Lofton to make sure he was breathing. She tapped him twice and he appeared to snore in response. The third time Conklin tapped Lofton, he did not respond. Conklin rolled Lofton over onto his back and performed a sternal rub. Lofton did not respond. When Lofton did not respond to the sternal rub, Conklin began chest compressions on Lofton.

8

At 5:13 a.m., Stepien called 911 to report that Lofton had become non-responsive. Conklin continued to perform chest compressions while they awaited EMS. At 5:15 a.m., Buckner relieved Conklin. At 5:19 a.m., EMS arrived. EMS took over providing aid to Lofton and ultimately transported him to Wesley Medical Center Hospital.

*Id.* at 2841–44.

Two days later, on September 26, 2021, Mr. Lofton was pronounced dead at the Wesley Medical Center Hospital. An autopsy performed by Dr. Timothy Gorrill reported Mr. Lofton's death as a homicide, caused from "complications of cardiopulmonary arrest sustained after physical struggle while restrained in the prone position." *Id.* at 2844 (quoting App. Vol. III at 588). A forensic pathologist, Dr. Jane Turner (Mr. Teetz's expert) reported that Mr. Lofton's "most severe injuries were located at his shoulders and back." *Id.* She further reported the acute hemorrhaging in those areas was indicative of blunt force trauma.

After setting out the above narrative, the district court noted that the parties "vehemently dispute[d] (1) whether the officers put substantial or significant pressure on [Mr.] Lofton's back, and (2) whether [Mr.] Lofton was quickly subdued." *Id.* at 2850. The district court noted that Mr. Stepien, Mr. Newby, Mr. Buckner, and Ms. Conklin each testified they never applied body weight or significant pressure to Mr. Lofton's back or airway, but that Dr. Gorrill's and Dr. Turner's reports contradicted that testimony. Specifically, the medical reports concluded that Mr. Lofton's injuries were consistent with significant weight or pressure being applied to Mr. Lofton's back and airway, and that this pressure contributed to Mr. Lofton's cardiac arrest and death. The district court

9

noted this conflicting evidence presented a material factual dispute as to the amount of force used and the immediacy of the threat posed by Mr. Lofton.

As to whether and how quickly Mr. Lofton was subdued, the district court again noted Mr. Buckner, Ms. Conklin, Mr. Newby, and Mr. Mendoza all testified that Mr. Lofton's struggle was continuous. The district court also noted Defendants argued Dr. Gorrill's report, which stated Mr. Lofton died due to "complications of cardiopulmonary arrest sustained after *physical struggle* while restrained in the prone position," likewise provided evidence Mr. Lofton was not subdued. *Id.* at 2853 (quoting App. Vol. III at 588). In contrast, Mr. Teetz pointed to the video surveillance evidence, which he argued showed that Mr. Lofton was subdued within five minutes of being restrained and showed no signs of Mr. Lofton fighting, resisting, struggling to get up, or being combative. Mr. Teetz also argued Dr. Gorrill's report, properly construed, showed that Mr. Lofton's injuries were primarily from the blunt force trauma, not his physical restraint, comporting with his version of events.

The district court noted that because the security camera was in the JIAC lobby, it captured only part of the holding room through two windows. This resulted in Mr. Lofton being out of view for most of the video, with "intermittent movement . . . as various backs, legs, and heads of the officers" became visible through the holding room's door and windows. *Id.* at 2854. The district court concluded that "due to the camera angle and lack of audio, it is unclear whether the officers' movement is due to a struggle against [Mr.] Lofton or whether the officers are merely readjusting or repositioning." *Id.* The district court further observed that it "seem[ed] obvious" that Mr. Lofton "was not

completely subdued after the five-minute mark," but "there are large gaps of time—even acknowledged by Defendants—during which no observable movement occurs," including from 29:23 to 41:25 of the video, a twelve-minute period. *Id.* The district court concluded these "stagnant moments reasonably beg the question of whether [Mr.] Lofton was effectively subdued" such that continued use of the prone position constituted excessive force—a material factual dispute to be resolved by the factfinder. *Id.*

### B.     *Defendants' Contentions*

While mostly relying on the district court's recitation of the facts, Defendants argue the following evidence in the summary judgment record supports their "blatant contradiction" argument.

First, Defendants expand on the opinion of Dr. Gorrill, who stated in his deposition that the cause of Mr. Lofton's death was "combinatorial" and "multi-factorial" in response to a question about whether his struggle or the restraint played a greater role. App. Vol. III at 585–86. Defendants also point to a report from one of Mr. Teetz's other medical experts, Dr. Alon Steinberg, who opined that Mr. Lofton was "struggling mightily" until he lost consciousness and that even after the point he was handcuffed, forty-six minutes into the video footage, he "continued to struggle and was obviously alive." *Id.* at 604. Defendants contend this testimony supports a finding that Mr. Lofton was struggling during the entire encounter. Second, while Defendants specifically state they do not challenge the "stagnant moments" factual finding concerning the video, they stress that the video footage is "inconclusive" and because Mr. Lofton was completely

11

out of view, the footage alone was insufficient to create a dispute of fact as to whether

Mr. Lofton was under control. Appellants' Br. at 7.

### C.     *Procedural History*

Mr. Teetz filed suit in June 2022, bringing claims against Defendants under 42

U.S.C. § 1983 for use of excessive force, failure to intervene, and deliberate indifference

to serious medical need, in addition to state law claims for negligence, battery, intentional

and negligent infliction of emotional distress, and supervisory liability. After Defendants

answered and the parties conducted discovery, Defendants moved for summary

judgment. The district court granted in part and denied in part Defendants' motion.

Relevant to this appeal, the district court denied Defendants' motion for summary

judgment insofar as they sought to dismiss the excessive force claims based on qualified

immunity. The district court explained that in evaluating an excessive force claim, it must

consider, under the factors enumerated in *Graham v. Connor*, 490 U.S. 386 (1989),

whether the use of force was "reasonable." App. Vol. XII at 2846. Namely, a court

considers "(1) the severity of the alleged crime, (2) the degree of potential threat that the

suspect poses to an officer's safety and to others' safety, and (3) the suspect's efforts to

resist or evade arrest." *Id.* (citing 490 U.S. at 396).

As to the first *Graham* factor—severity of the crime at issue—the district court

found it weighed in Defendants' favor because the video evidence showed that

Mr. Lofton punched Mr. Stepien in the face, a battery against a juvenile detention facility

officer that constituted a felony under Kansas law.

As to the second *Graham* factor—threat to immediate safety of Defendants—the district court determined that because Mr. Lofton was ignoring commands, making verbal threats, and then began to fight back against Defendants at the outset of the interaction, it was reasonable to use force to restrain Mr. Lofton. But what was more "complex" was "whether [Mr.] Lofton remained a safety threat throughout the 40-minute duration of the officers' restraint," or whether at some point he was in Defendants' control such that force was no longer reasonable. *Id.* at 2849. The district court noted that the parties disputed whether Defendants put "substantial or significant pressure" on Mr. Lofton's back and how quickly Mr. Lofton was subdued. *Id.* at 2850. Specifically, Defendants testified they never put pressure on Mr. Lofton's back or airway, but Mr. Teetz's experts opined significant weight had been applied to those areas. Because a rational jury could credit Mr. Teetz's version of events (that significant pressure had been placed on Mr. Lofton's back), there was a dispute of material fact as to the second *Graham* factor.

As to the third *Graham* factor—whether Mr. Lofton resisted—the district court noted use of the prone restraint is considered unreasonable after an arrestee is subdued or incapacitated. The court determined that there was also a material dispute of fact as to this factor. Defendants had testified that there was a continuing struggle between them and Mr. Lofton requiring continued force. Mr. Teetz, for his part, pointed to the video footage which depicted no signs of an ongoing struggle, although it did not show Mr. Lofton. Mr. Teetz further argued that the medical expert's report opining that Mr. Lofton's death was caused by blunt force trauma due to a prone restraint indicated the lack of a continuous struggle. The court described the video as inconclusive: "it is

13

unclear whether the officers' movement is due to a struggle against [Mr.] Lofton or whether the officers are merely readjusting or repositioning due to the holding room's relatively small size." *Id.* at 2854. The district court also acknowledged "large gaps of time" in the video with "no observable movement," including an almost twelve-minute interval that Defendants acknowledged did not demonstrate Mr. Lofton resisting. *Id.* The court concluded that whether Defendants had sufficient control over Mr. Lofton such that he was "effectively subdued" during those "stagnant moments" was a genuine dispute of material fact that could not be resolved on summary judgment. *Id.* at 2854–55. Therefore, it denied summary judgment as to the excessive force counts. It also denied summary judgment as to the failure to intervene claims that were predicated on underlying excessive force claims.

Defendants timely appealed.

## II.    JURISDICTION

The district court had subject matter jurisdiction over Mr. Teetz's § 1983 claims under 28 U.S.C. § 1331 because they arose under federal law. It had supplemental jurisdiction over Mr. Teetz's state law claims under 28 U.S.C. § 1367. Defendants timely appealed the denial of their motion for summary judgment based on qualified immunity. Pursuant to the collateral order doctrine, we have jurisdiction over their appeal under 28 U.S.C. § 1291. *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1161–62 (10th Cir. 2021).

14

In this interlocutory posture, our appellate jurisdiction is limited to a review of "abstract questions of law," namely, "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, and (2) whether that law was clearly established at the time of the alleged violation." *Vette*, 989 F.3d at 1162 (internal quotation marks omitted). "In the same vein, this court generally lack[s] jurisdiction to review factual disputes in this interlocutory posture, including the district court's determination . . . that the evidence could support a finding that particular conduct occurred." *Id.* (alterations in original) (internal quotation marks omitted). A "narrow" exception to this jurisdictional limitation exists where "the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record." *Clerkley v. Holcomb*, 121 F.4th 1359, 1363 (10th Cir. 2024) (internal quotation marks omitted); *see Scott v. Harris*, 550 U.S. 372, 380 (2007). Where this exception applies, "[w]e may . . . review the factual record *de novo*." *Simpson v. Little*, 16 F.4th 1353, 1360 (10th Cir. 2021). However, "[t]his standard is a very difficult one to satisfy." *Vette*, 989 F.3d at 1162 (internal quotation marks omitted). "We will not look beyond the facts found and inferences drawn by the district court unless those findings constitute visible fiction." *Id.* (internal quotation marks omitted).

Another exception to this jurisdictional limit recognizes that we may review a district court's factual determinations *de novo* where the court "commits *legal* error en route to a *factual* determination." *Simpson*, 16 F.4th at 1360 (internal quotation marks omitted). We discuss the applicability of these exceptions below.

### III.    STANDARD OF REVIEW

"Within this court's limited jurisdiction, we review the district court's denial of a summary judgment motion asserting qualified immunity de novo." *Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Cronick v. Pryor*, 99 F.4th 1262, 1267 (10th Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). "We view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Id.* (internal quotation marks omitted).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry," first asking "whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong considers "whether the right in question was 'clearly established.'" *Id.* at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Qualified immunity cases in particular "illustrate the importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong of the standard." *Id.* at 657. This is because the "clearly established" prong depends on "the specific context of the case." *Id.* (quoting *Saucier*, 533 U.S. at 201).

16

## IV.     ANALYSIS

First, we discuss whether we have jurisdiction to review the district court's factual findings in this interlocutory appeal. Concluding that we do not, we then turn to the merits of Defendants' qualified immunity argument.

### A.     *Blatant Contradiction Exception*

As discussed in Part II, *supra*, our jurisdiction to review the district court's order granting summary judgment is "limited to abstract questions of law" unless Defendants can demonstrate an exception applies. *Vette*, 989 F.3d at 1162. Defendants primarily assert that the district court wrongly relied on an "inconclusive" video, and that the record "blatantly contradicts" the district court's finding that a dispute of material fact exists as to whether Mr. Lofton was subdued at some point in the encounter, and therefore we should revisit that finding. Appellants' Br. at 10–11. Defendants also seek to blend the "blatant contradiction" exception with the "legal error" exception, asserting that "the district court committed legal error in making its factual determination because it relied on inconclusive video evidence to conclude a dispute of fact exists as to whether [Mr.] Lofton was effectively subdued or resisting." Appellants' Br. at 10. We disagree.

First, as to the "blatant contradiction" exception, it generally applies only where "[d]ocumentary evidence" such as videos or photographs "utterly discredit[s]" the version of events found by the district court. *Vette*, 989 F.3d at 1164. The Supreme Court found this exception appropriate in *Scott v. Harris*, in which video evidence unmistakably showed the plaintiff engaged in reckless driving, directly contradicting the plaintiff's

17

asserted facts at summary judgment. *See* 550 U.S. at 380–81 (explaining video evidence rendered the plaintiff's contrary version of events "visible fiction"). But in *Vette*, we rejected an argument that because certain photographs taken at the scene *failed* to show the plaintiff had been struck in the face, they "utterly discredit[ed]" the plaintiff's account. 989 F.3d at 1165–66. We reasoned that the photographs showed only one side of the plaintiff's face, and thus did not conclusively demonstrate whether the plaintiff had been struck by a dog chain. *Id.* at 1166. We explained that the photographs could not "belie" the assertion the plaintiff had been struck in the face, rather, they were "consistent with *the possibility* that [the defendant] battered the left side of [the plaintiff's] face." *Id.* (emphasis added). Accordingly, we declined to apply the exception.

Put another way, the blatant contradiction exception does not apply where documentary evidence could plausibly support two competing versions of events. Here, Defendants argue that because Mr. Lofton cannot be seen on the surveillance video while he was being subjected to the prone restraint, the video "is objectively inconclusive," and therefore *other evidence*, chiefly Defendants' own testimony, "blatantly contradicts" the district court's finding that there is a material dispute as to whether Mr. Lofton was subdued or not. Appellants' Br. at 13. This argument is incompatible with our analysis in *Vette*. There, we recognized that testimonial evidence "simply do[es] not constitute the type of evidence that could satisfy the exception." 989 F.3d at 1165. While we have applied this exception "where the plaintiff herself was the source of the testimonial evidence blatantly contradicting her [own] account . . . we have not extended the exception to circumstances in which the court is merely presented with two parties'

conflicting testimonial accounts of the same events." *Id.* Thus, we have specifically declined "to extend the exception where the source of the contradictory testimony is the defendant himself." *Id.* Moreover, as we have recognized, because "the victim of deadly force is unable to testify, courts should be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story . . . is unable to testify." *Pauly v. White*, 874 F.3d 1197, 1217–18 (10th Cir. 2017) (quoting *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999)).

Defendants assert that the medical expert testimony also supports their version of events and—together with their own testimony—"blatantly contradicts" the video. Appellants' Br. at 14–15. Again, we are unpersuaded. As the district court determined, the full medical expert reports would allow a reasonable jury to conclude that, contrary to Defendants' testimony, they placed significant weight on Mr. Lofton. The court also acknowledged that while Defendants argued the medical report showed Mr. Lofton was struggling the entire time, Mr. Teetz argued the report showed that Mr. Lofton's death resulted from pressure placed on him during the prone restraint, not from his "physical response" to the restraint. *Id.* at 2853–54. The district court did not specifically hold that either party's interpretation of the medical report was correct; instead, it concluded that when combined with the video footage a factual dispute remained as to whether Mr. Lofton was struggling the entire time. Implicit in this conclusion was the fact that a jury could credit either party's interpretation of the medical expert report's reference to "struggle." *See id.* at 2854–55. This "conflicting" evidence is simply "not . . . the type of evidence that could satisfy the [blatant contradiction] exception." *Vette*, 989 F.3d at 1165.

19

For that reason, Defendants fail to show that their own testimonial evidence and the medical expert report "blatantly contradict" the video's depiction of significant periods of time where Mr. Lofton seems to be subdued.

As to the video evidence itself, *Vette* recognized that where documentary evidence is "consistent with" a plaintiff's version of events, even if that evidence is inconclusive, it does not qualify for the "blatant contradiction" exception. *Id.* Here too, the surveillance footage unquestionably shows the five officers restraining Mr. Lofton are not moving at all for long stretches of time, even though it does not show Mr. Lofton as he is being restrained. This is in contrast from the earlier moments of the struggle where the officers do move and flail as they seek to restrain Mr. Lofton. That video evidence is consistent with Mr. Teetz's version of events that Mr. Lofton had been subdued.[2] Of course, the evidence could also be consistent with Defendants' version of events, which is that Mr. Lofton continued to struggle out of view of the camera. Given that two versions of

---

[2] By contrast, in *Estate of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049 (10th Cir. 2020), we held that video footage of a suspect was sufficient to disturb a district court's factual finding that the suspect was dropping his weapon, because based on the video, "no jury could doubt that [the officer] made his decision to fire before he could have realized that [the suspect] was surrendering." *Id.* at 1062. Because the analysis in *Valverde*—a use-of-force case involving an armed suspect—came down to the police officer's reasonable belief he was in danger in the split-second moment he was faced with a gun, the majority held the video evidence was conclusive enough to invoke the exception. *Id.* at 1062–63. Here, the video does not foreclose either version of events, much less render Mr. Teetz's version of events a "visible fiction." *Scott v. Harris*, 550 U.S. 372, 381 (2017).

events could be true, the district court correctly determined there is a material factual dispute; nothing in the record "blatantly contradicts" that finding.[3]

Finally, we reject Defendants' argument that the district court made a "*legal* error en route to a *factual* determination." *Pahls*, 718 F.3d at 1232. Under this exception, we must review the factual record where a district court's misunderstanding of the law has caused it to fail to make necessary factual findings or view the facts through an erroneous legal framework. In *Pahls*, for instance, the district court assumed it did not have to individually analyze the defendants' actions in a First Amendment case and therefore did not make factual findings as to each defendant. *Id.* at 1231–32. We did that necessary factual work on appeal to resolve the qualified immunity claims. *Id.* at 1233–43; *see also Works v. Byers*, 128 F.4th 1156, 1162–63 (10th Cir. 2025) (reviewing the record *de novo* where district court viewed facts through erroneous legal framework). Here, Defendants have not identified a legal error the district court made at the outset that caused it to fail to

---

[3] Defendants' reliance on *Ames v. City of Tempe*, No. 23-15609, 2024 WL 1502267 (9th Cir. Apr. 8, 2024) (unpublished) is unavailing. In *Ames*, which involved a plaintiff's appeal from the grant of summary judgment based on qualified immunity, body camera footage of an alleged instance of excessive force was "inconclusive." *Id.* at *1. At the same time, officer testimony presented one version of events, and the plaintiff failed to submit a declaration or testimony providing a contrary version of events. *Id.* In those circumstances, the Ninth Circuit rejected an argument that the body camera footage had to "conclusively corroborate" the plaintiff's asserted facts. *Id.* Rather, the court held where the plaintiff identified no evidence which could create a factual dispute, summary judgment was appropriate. *Id.* Here, by contrast, the district court held the video showed enough of the altercation to support Mr. Teetz's version of events.

make necessary factual findings or view the facts through an erroneous legal framework. As such, it did not engage in a "*legal* error en route to a *factual* determination." *Pahls*, 718 F.3d at 1232. Therefore, the legal error exception does not allow us to review the factual record here.

Because we conclude that neither the blatant contradiction exception nor the *Pahls* exception apply, we "accept [the] facts the district court assumed true at summary judgment" as we turn to the merits. *Vette*, 989 F.3d at 1167 (internal quotation marks omitted).

### B.     Merits

As discussed, to overcome a qualified immunity defense, a plaintiff must "(1) raise a genuine issue of material fact that the defendant violated a federal constitutional or statutory right, and (2) show the right was clearly established at the time of the defendant's violative conduct." *Simpson*, 16 F.4th at 1359. We discuss each prong in turn.

### 1.     Constitutional Violation

Mr. Teetz argues that the use of the prone restraint constituted excessive force. We agree and affirm the district court on that basis. Indeed, the use of a prolonged prone restraint after a defendant is subdued constitutes deadly force which is justified only in limited circumstances under our precedent.

#### a.     Excessive Force

Mr. Teetz asserts that Defendants used excessive force when they placed Mr. Lofton in the prone restraint, violating his Fourth Amendment rights. We analyze this

22

claim "under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395. Our inquiry "is an objective one," and we ask, "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008) (quoting *Graham*, 490 U.S. at 396). We have recognized that the second *Graham* factor "is undoubtedly the 'most important' . . . factor in determining the objective reasonableness of an officer's use of force." *Pauly*, 874 F.3d at 1216 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). "Additionally, 'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Weigel*, 544 F.3d at 1152 (quoting *Graham*, 490 U.S. at 396).

As the Supreme Court has recently emphasized, a court "must consider all the relevant circumstances, including facts and events leading up to the climactic moment," rather than just the "moment-of-threat," in assessing the reasonableness of force under *Graham*. *Barnes v. Felix*, No. 23-1239, 2025 WL 1401083, at *2 (U.S. May 15, 2025). "There is no 'easy-to-apply legal test' or 'on/off switch' in this context." *Id.* at *4 (quoting *Scott*, 550 U.S. at 382–383). "Rather, the Fourth Amendment requires, as we once put it, that a court 'slosh [its] way through' a

23

'factbound morass.'" *Id.* (alteration in original) (quoting *Scott*, 550 U.S. at 383). This analysis "has no time limit." *Id.* While "the situation at the precise time" of the use of force "will often be what matters most . . . . earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.*

Defendants argue the district court erred in determining that using a prone restraint on a suspect who "is resisting and making threats," as they contend Mr. Lofton was, constituted a constitutional violation. Appellants' Br. at 19. In so doing, Defendants rely on a version of the facts not found by the district court at summary judgment—that is, a version of the facts in which Mr. Lofton was struggling the entire time. As discussed *supra*, we have accepted the district court's finding that there is a material factual dispute as to whether Mr. Lofton was effectively resisting throughout the entire encounter, or whether Defendants had effectively subdued him. Accordingly, to the extent Defendants' arguments rely on the assumption that Mr. Lofton was unsubdued the entire time, we reject them. *See also* Oral Argument at 4:35–5:24 (conceding that Defendants lose if district court found a jury could conclude that there were long periods of time with no resistance and none of the exceptions apply allowing this court to review that factual finding).

Accordingly, we analyze whether the force at issue here under the facts found by the district court—Defendants putting Mr. Lofton in leg restraints and holding him down in the prone position for a prolonged period of time, including by putting weight on his back—was excessive. And we assume that, viewing the facts in the

24

light most favorable to Mr. Teetz, a jury could conclude that Mr. Lofton had ceased struggling at some point during the prone restraint.

The first *Graham* factor (severity of the crime) weighs in Defendants' favor because Mr. Lofton had committed battery against a juvenile detention facility officer. *See Vette*, 989 F.3d at 1170 ("[T]he first *Graham* factor weighs against the plaintiff when the crime at issue is a felony."). But where—as here—we conclude the remaining factors weigh in Mr. Lofton's favor, Defendants cannot prevail under the totality of the circumstances. *See id.*

The second and most important *Graham* factor (immediacy of the threat) weighs in Mr. Lofton's favor. Again, "[i]n evaluating this factor, we must look at whether [Defendants] were in danger at the precise moment they used force," *id.* (internal quotation marks omitted), mindful of the Supreme Court's caution that the totality-of-the-circumstances analysis "has no time limit," *Barnes*, 2025 WL 1401083, at *4. Importantly, the district court concluded a reasonable jury could find that Mr. Lofton stopped resisting at some point during the prone restraint. And under our precedent, we separately evaluate whether use of force is reasonable under *Graham* when there is a pre-restraint and post-restraint period, and a jury could find the defendants had time to evaluate whether the suspect had become compliant such that force was no longer reasonable. *See, e.g.*, *Weigel*, 544 F.3d at 1152 ("[T]here is evidence that Mr. Weigel was subjected to such pressure for a significant period after it was clear that the pressure was unnecessary to restrain him."); *McCoy v. Meyers*,

25

887 F.3d 1034, 1048–49 (10th Cir. 2018) (separately analyzing pre-restraint and post-restraint force).

In the video when Mr. Lofton had arguably ceased resisting, *five* Defendants continued to place pressure on the prone Mr. Lofton's upper back, legs, and arms, while his legs were in a restraint. The district court found there were intervals for as long as twelve minutes with no apparent movement from Mr. Lofton. And moreover, using the district court's timeline, the total length of the prone restraint was at least thirty minutes. A reasonable jury could conclude that Mr. Lofton, at some point during this long period, was subdued and restrained, and therefore did not pose an immediate threat such that the continued use of force was reasonable. *See Weigel*, 544 F.3d at 1152 (holding use of prone restraint on handcuffed suspect with leg restraints constituted excessive force because there the decedent "was subjected to such pressure for a significant period after it was clear that the pressure was unnecessary to restrain him").

The third *Graham* factor (active resistance or evading arrest) also weighs in Mr. Lofton's favor. After the point he ceased to struggle and was restrained at the legs, Mr. Lofton was not "actively resisting or attempting to evade arrest by flight," in fact, flight was impossible. *Graham*, 490 U.S. at 396; *see also Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x 774, 782 (10th Cir. 2019) (unpublished) (holding even where a suspect was still resisting arrest, because his legs were shackled and it was therefore impossible for him to flee, this factor

26

weighed in his favor).[4] Additionally, Mr. Lofton was inside a holding cell within JIAC, a controlled facility, which further indicates that the risk of evading arrest by flight was minimal; he was not in a dynamic or dangerous setting such as the side of a highway, *see Weigel*, 544 F.3d at 1147–48, or an open field after fleeing arrest, *Vette*, 989 F.3d at 1159.

In short, under the three *Graham* factors and considering the totality of the circumstances in the light most favorable to Mr. Teetz—five officers were in the holding room and had control over Mr. Lofton including by putting weight on his back, Mr. Lofton had ceased resisting, Mr. Lofton's legs were shackled, and Mr. Lofton was an unarmed juvenile experiencing a mental health crisis in a secure room in a juvenile facility—we readily conclude a reasonable jury could find that the continued use of a prone restraint was unreasonable. Accordingly, Mr. Teetz has met the first prong of the qualified immunity test by showing a reasonable jury could conclude Defendants violated Mr. Lofton's Fourth Amendment right to be free of excessive force.

### b. *Deadly Force*

While we conclude that Mr. Teetz has met his burden to show a constitutional violation, it is also true that the use of the prone restraint under these circumstances constituted deadly force.

---

[4] We cite unpublished cases for their persuasive value only and do not treat them as binding authority. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

The use of deadly force is "subject to the reasonableness requirement of the Fourth Amendment," *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), and evaluated under the *Graham* factors, *see, e.g.*, *Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020). "[D]eadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009). "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape." *Garner*, 471 U.S. at 11. But "serious physical harm . . . . does not mean [] any risk of physical harm to others, no matter how slight." *Cordova*, 569 F.3d at 1190 (internal quotation marks omitted). Instead, we consider "the degree of threat facing officers" using "a number of non-exclusive factors," including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Our cases that find the *Larsen* factors weigh in law enforcement's favor almost always find the officers reasonably perceived the suspect possessed a weapon that could be used to inflict deadly injury or serious physical harm. *See, e.g.*, *id.* (suspect carried knife with a footlong blade); *Est. of George v. City of Rifle*, 85 F.4th 1300, 1317–18 (10th Cir. 2023) (suspect carried gun); *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 766–67

(10th Cir. 2021) (officer reasonably perceived unarmed suspect carried a gun); *Flores v. Henderson*, 101 F.4th 1185, 1194 (10th Cir. 2024) (suspect carried machete). Only in rare cases have we found deadly force is justified when a suspect is unarmed, and in those cases, officers faced extremely dangerous and rapidly evolving circumstances. *See, e.g.*, *Waterhouse v. Direzza*, 129 F.4th 1212, 1223 (10th Cir. 2025) (holding deadly force justified where officers encountered suspect in burning basement and could have been killed in the fire had the suspect fought them).

In conducting the *Larsen* analysis, we consider the totality of the circumstances, including whether "the officers were in danger at the precise moment that they used force." *Reavis*, 967 F.3d at 985 (quotation marks omitted). Further, "the question of whether there is no threat, an immediate deadly threat, or that the threat has passed, at the time deadly force is employed must be evaluated based on what a reasonable officer would have perceived under the totality of the circumstances." *Id.* at 988. And as the Supreme Court has recently reminded us, while "the situation at the precise time" of the use of force "will often be what matters most," the totality of the circumstances analysis "has no time limit," and "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Barnes*, 2025 WL 1401083, at *4.

For example, in *Estate of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020), we determined that the facts taken in the light most favorable to the plaintiffs could enable a reasonable jury to conclude that the defendant police officer "had the opportunity to perceive that any threat [posed by Mr. Smart] had passed by the

29

time [the officer] fired his final shots." *Id.* at 1175. In those circumstances, we concluded the officer would have violated clearly established law by using deadly force after it "would have been clear to a reasonable officer that the perceived threat had passed." *Id.* at 1176. Similarly, in *Fancher*, we affirmed the denial of qualified immunity when the officer "fired six shots into a suspect who was no longer able to control the vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public . . . or other responding officers." 723 F.3d at 1201 (internal quotation marks omitted). "This allowed [the officer] enough time . . . to recognize and react to the changed circumstances and cease firing his gun." *Id.* (internal quotation marks omitted). In short, "the use of deadly force is unreasonable when a reasonable officer would have perceived that the threat had passed." *Reavis*, 967 F.3d at 989.

Additionally, although the limited use of a prone restraint to obtain control of a suspect can be a proper police procedure, we have long recognized that prone restraints can constitute deadly force if prolonged. For example, in *Weigel*, we held an officer used excessive force where a prone restraint was used "for about three minutes" on a suspect while he was handcuffed and his feet were bound. 544 F.3d at 1152–53. In so holding, we explained that the defendants "subjected [Mr. Weigel] to force that they knew was unnecessary to restrain him and that a reasonable officer would have known presented a significant danger of asphyxiation and death." *Id.* at 1153. "Because it is clearly established law that deadly force cannot be used when it is unnecessary to restrain a suspect or secure the safety of officers, the public, or the

suspect himself, *the defendants' unnecessary use of deadly force* violated clearly established law." *Id.* at 1155 (emphasis added).[5]

Whether the use of a prone restraint—deadly force—on Mr. Lofton was justified by immediate threat to officer safety can be analyzed under the *Larsen* factors—his compliance with commands, hostile motions made by Mr. Lofton, distance between Mr. Lofton and the officers, and Mr. Lofton's manifest intentions. *See Larsen*, 511 F.3d at 1260. Mr. Lofton was a barefoot teenager acting erratically, resisting and fighting Defendants while hurling death threats and making bizarre statements. However, he was also unarmed. And while he was hitting Defendants and at one point choking Officer Newby, it is not clear he was capable of inflicting "*serious* bodily injury" such that deadly force was reasonable. *Cf. id.* at 1260 (holding factors weighed in officers' favor where two officers encountered full grown man with large knife "over a foot in length" and suspect refused to comply with commands to drop weapon); *Alcala v. Ortega*, 128 F.4th 1298, 1308–13 (10th Cir. 2025) (holding deadly force was reasonable where uncompliant suspect made sudden motion as if drawing a gun).

---

[5] Other circuits have recognized—some repeatedly—that putting weight on a subdued suspect's back for a prolonged period can constitute not just excessive but deadly force. *See, e.g.*, *Timpa v. Dillard*, 20 F.4th 1020, 1033–34 (5th Cir. 2021); *Aguirre v. City of San Antonio*, 995 F.3d 395, 414 (5th Cir. 2021); *Abdullahi v. City of Madison*, 423 F.3d 763, 770–71 (7th Cir. 2005); *Scott v. Smith*, 109 F.4th 1215, 1223 (9th Cir. 2024).

But even if we assume that at the beginning of the encounter, under the *Larsen* factors, Defendants reasonably perceived a serious threat to their safety that justified the use of deadly force, that calculus changed once "the threat ha[d] passed." *Reavis*, 967 F.3d at 988. And here, the district court found a reasonable jury could conclude that for long stretches of time, including for a period lasting twelve minutes, Mr. Lofton was no longer meaningfully resisting, and Defendants had sufficient control over him. At that point, a reasonable officer would have perceived the threat had passed and that the use of deadly force was no longer reasonable. *See id.*; *see also Est. of Smart*, 951 F.3d at 1176–77.

Instead, *five* officers continued to subject Mr. Lofton to a prone restraint while his legs were restrained and he appeared not to move for prolonged periods. In total, Defendants subjected Mr. Lofton to the prone restraint for at least thirty minutes. This is far more egregious than the three-minute prone restraint we held was unconstitutional deadly force in *Weigel. See* 544 F.3d at 1153. We therefore conclude Defendants violated Mr. Lofton's Fourth Amendment rights not just by using excessive force, but by using deadly force well past the point a reasonable officer would have perceived any serious threat to his physical safety had passed.

A recent decision from the Supreme Court, *Lombardo v. City of St. Louis*, 594 U.S. 464 (2021), supports our view of prolonged prone restraints. There, the majority vacated the Eighth Circuit's affirmance of summary judgment on the basis of qualified immunity, holding that "it is unclear whether the court thought the use of a prone restraint—no matter the kind, intensity, duration, or surrounding circumstances—is

32

*per se* constitutional so long as an individual appears to resist officers' efforts to subdue him." *Id.* at 467. In dissent, Justice Alito took issue with the majority's characterization of the Eighth Circuit's position, asserting it had not adopted "such a strange and extreme position." *Id.* at 470 (Alito, J., dissenting). Justice Alito offered a hypothetical that illustrates the important nuances affecting the reasonableness of a prone restraint:

> Can the Court seriously think that the Eighth Circuit adopted such a strange and extreme position—that the use of prone restraint on a resisting detainee is always reasonable no matter how much force is used, no matter how long that force is employed, no matter the physical condition of the detainee, and no matter whether the detainee is obviously suffering serious or even life-threatening harm? Suppose officers with a combined weight of 1,000 pounds knelt on the back of a frail and infirm detainee, used all their might to press his chest and face into a concrete floor for over an hour, did not desist when the detainee cried, "You're killing me," and ended up inflicting fatal injuries. Does the Court really believe that the Court of Appeals might have thought that this extreme use of force would be reasonable?

*Id.*

True enough, the prone restraint here lasted less than the hour in the hypothetical, but the length of the restraint was well beyond the three minutes that proved fatal in *Weigel*. The five Defendants here had a similar combined weight as imagined in the hypothetical, put that weight on the body of a seventeen-year-old juvenile experiencing a mental health crisis, and did not desist until he was unresponsive.

As Justice Alito recognized, the use of prone restraint—even where a suspect is "resisting" to some degree—becomes unreasonable where officers become aware the suspect is experiencing life-threatening harm but nonetheless continue to apply

33

the restraint. *Id.* And as we have recognized since *Weigel*, this can be true even when a suspect fights back at the beginning of an encounter, or struggles after restraints are placed. *See* 544 F.3d at 1149, 1153 (noting Mr. Weigel may have continued to struggle for a minute and a half into three-minute restraint but holding continued use of force once Mr. Weigel was subdued was unreasonable). When a suspect is subject to a prone restraint past the point a reasonable officer would know the restraint is unnecessary, that force is unreasonable because "a reasonable officer would have known" the prone restraint "present[s] a significant danger of asphyxiation and death." *Id.*

In short, an officer cannot continue to employ a prone restraint while putting weight on the suspect's back past the point that the suspect no longer poses a risk of serious bodily injury to the officer or others, such as when the suspect is restrained in handcuffs or leg restraints. This may include situations where the suspect continues to resist to some degree, physically or verbally, but no longer poses a risk of *serious* harm or injury due to the restraints. *See id.*; *Lynch*, 786 F. App'x at 780, 782 (holding use of prone restraint on suspect after his hands and legs were shackled was excessive even where suspect "continued to struggle and hurl insults at the officers").

Finally, we recognize that the *Graham* analysis requires us to view the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396. And we acknowledge that officers often face circumstances that are "tense, uncertain, and rapidly evolving" during which they are forced to make "split-second judgments." *Est. of Taylor*, 16 F.4th at 761 (quotation

34

marks omitted). We cannot "Monday morning quarterback[]" the reasonableness of the use of deadly force from the comfort of a judge's chambers. *Id.* (quoting *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011)). Even within those parameters, however, given the totality of the circumstances here—which involves a minor suffering a mental health crisis, within a controlled facility, who had no weapon, and was fighting back at first but eventually stopped resisting—a reasonable officer on the scene would have known that continued use of the prone restraint after it was unnecessary constituted deadly force. As we explained in *Weigel*:

> We recognize the events leading up to Mr. Weigel's death happened quickly. We further acknowledge that, up to a point, the troopers were protecting themselves and the public from Mr. Weigel and Mr. Weigel from himself. *But we are not addressing split second decisions by law enforcement officers to protect themselves and the public*. Nor are we stating that the troopers necessarily acted unreasonably. If, however, the facts plaintiffs proffered are true and the jury draws the inferences most supportive of plaintiffs' position, then the law was clearly established that applying pressure to Mr. Weigel's upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions.

544 F.3d at 1155 (emphasis added).

Here too, we are not addressing a split-second decision in a life-or-death situation. Rather, the jury could find that Defendants imposed a prone restraint for as much as thirty minutes, during which "stagnant moments" for as long as *twelve* minutes indicate Mr. Lofton had ceased resisting. Under those facts, if proved, the use of deadly force was unreasonable and unconstitutional.

35

2.    **Clearly Established**

It was clearly established by the date of this incident (September 24, 2021) that subjecting Mr. Lofton to a prolonged prone restraint and putting weight on him when he was also shackled at the legs, with his arms restrained by the officers, and no longer resisting constituted excessive force, even where he resisted vigorously during the first part of the encounter.

For example, in *Weigel*, highway patrol troopers asked Mr. Weigel to submit to a field sobriety test after a traffic accident. Mr. Weigel broke away from the officers and attempted to cross the interstate. 544 F.3d at 1147–48. Concerned for his safety, one of the troopers tackled Mr. Weigel and wrestled him to the ground next to the highway. *Id.* at 1148. Following a "vigorous[]" struggle which involved troopers and bystanders, the officers eventually restrained Mr. Weigel face-down, handcuffed, and with plastic tubing connecting his ankles. *Id.* One officer "applied pressure to Mr. Weigel's upper body," a bystander "lay across the back of [his] legs," and another officer "straddle[d] [his] upper thighs and buttocks and held [his] arms in place." *Id.* At some point, Mr. Weigel had "quit struggling," and one trooper was so confident Mr. Weigel was subdued that he left the scene. *Id.* at 1149. Yet one officer and the bystander maintained their positions until Mr. Weigel went into cardiac arrest. *Id.* at 1148–49.

We concluded that, viewing the facts in the light most favorable to the plaintiffs, the use of force was not reasonable. *Id.* at 1152–53. We noted that the evidence could support a finding "that Mr. Weigel was subjected to [] pressure for a

36

significant period after it was clear that the pressure was unnecessary to restrain him," and that once he "was handcuffed and his legs were bound," with officers applying pressure to his upper back and legs, he did not "pose a threat to the officers, the public, or himself." *Id.* at 1152. Moreover, there was evidence he "was maintained in that position for about three minutes." *Id.* Thus, the officers subjected Mr. Weigel to force "they knew was unnecessary to restrain him and that a reasonable officer would have known presented a significant danger of asphyxiation and death" based on the officers' training materials. *Id.* at 1153.

Similarly, in *Estate of Booker*, we held that force was excessive where an officer "placed an estimated 142.5 pounds—more than Mr. Booker's overall weight—on Mr. Booker's back while he was handcuffed on his stomach." 745 F.3d at 424. He was also in an ankle restraint. *Id.* at 413–14. "Because of Mr. Booker's prone, restrained[] position, the placement of weight exceeding Mr. Booker's total body weight could be construed as substantial or significant." *Id.* at 424.[6] Notably,

---

[6] While "clearly established law may not be based on our unpublished decisions," *Surat v. Klamser*, 52 F.4th 1261, 1279 (10th Cir. 2022), some of our unpublished cases, which we cite for persuasive value only, further illustrate these principles have been clearly established in our published cases. *See Waters v. Coleman*, 632 F. App'x 431, 441–42 (10th Cir. 2015) (holding officer who continued to restrain handcuffed suspect in prone position for "several minutes" when he was aware of suspect's excited delirium used excessive force despite earlier resistance); *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x 774 (10th Cir. 2019) (holding force was excessive where two officers "lean[ed] into [suspect's] back and lower body with their knees after [his] hands and legs were restrained," while another stood "on the chain connecting the leg shackles").

the total time Mr. Booker was subject to the prone restraint and other forms of force was just under three minutes. See *id.* at 414.

While there are some factual dissimilarities between Mr. Lofton's restraint and the restraints described in *Weigel* and *Booker*, the facts are sufficiently similar to have put Defendants on notice that their actions were unconstitutional. *See Reavis*, 967 F.3d at 992 ("[O]ur analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." (quotation marks omitted)). For example, Mr. Lofton was not fully handcuffed until the end of the prone restraint, whereas in *Booker* and *Weigel*, the suspects were handcuffed early on. But two Defendants were applying "S.A.F.E. holds" to each of Mr. Lofton's wrists throughout the restraint, immobilizing his arms. App. Vol. XII at 2850. Because Mr. Lofton's legs were shackled and two officers were using the S.A.F.E. holds to restrain his arms, he was effectively restrained similarly to the suspects in *Booker* and *Weigel*. Moreover, five officers placed their weight on Mr. Lofton as opposed to one officer and one bystander in *Weigel*. And Defendants here subjected Mr. Lofton to a much longer prone restraint than the approximately three-minute restraints in both *Weigel* and *Booker*. Considering this precedent, Defendants were on clear notice that the use of a prolonged prone restraint of a subdued juvenile constituted excessive force.

Defendants' primary argument that the use of force was not clearly established as excessive again assumes that Mr. Lofton was effectively resisting for the entire

38

encounter. Specifically, Defendants argue that Mr. Teetz did not establish the violation of a constitutional right because "restraining a person in a prone position is not, in and of itself, excessive force when the person restrained *is resisting arrest*." Appellees' Br. at 20 (quoting *Giannetti v. City of Stillwater*, 216 F. App'x 756, 765 (10th Cir. 2007) (unpublished) (emphasis added)).[7] Based on the premise that Mr. Lofton was continuing to physically resist, Defendants distinguish other Tenth Circuit cases concerning post-restraint force in which suspects were handcuffed, zip-tied, or otherwise subdued. But as discussed *supra*, under the version of the facts the district court concluded a jury could credit, we assume that Mr. Lofton—at some point in the encounter—was subdued and under sufficient control by Defendants. And because Defendants conceded at oral argument that they "lose" this interlocutory

---

[7] Defendants' reliance on *Giannetti v. City of Stillwater*, 216 F. App'x 756 (10th Cir. 2007) (unpublished), is unpersuasive. In *Giannetti*, the suspect "continued to struggle and kick the officers, at one point sending one officer against a locker" while in a prone restraint. *Id.* at 765. Because of her constant and "escalating" opposition, we held the use of force was reasonable. *Id.* at 766. But here, as discussed, at some point Defendants gained control over Mr. Lofton such that continued use of the prone restraint was no longer reasonable.

Moreover, while we stated in our nonprecedential decision in *Giannetti* that "[r]estraining a person in a prone position is not, *in and of itself*, excessive force when the person restrained is resisting arrest," that statement has been clarified by later published decisions. *Id.* at 765 (quotation marks omitted) (emphasis added). Namely, in *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) we held that "applying pressure to [a suspect's] upper back, *once he was handcuffed and his legs restrained*, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions." *Id.* at 1155 (emphasis added). And in *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014), we reiterated that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position *after being subdued and/or incapacitated* constitutes excessive force." *Id.* at 424 (internal quotation marks omitted) (emphasis added).

appeal if we hold the district court properly determined a jury could find that Mr. Lofton ceased to struggle, *see* Oral Argument at 4:35–5:24, they have also conceded that the law is clearly established that using a prolonged prone restraint on a nonresistant, restrained suspect is unconstitutional.

Defendants similarly argue that Mr. Lofton made "continued" death threats throughout the encounter, and therefore they were not on notice that continued use of the restraint was unreasonable. Appellants' Br. at 21–22. But the district court's factual findings establish only that Mr. Lofton was making these statements at the beginning of the encounter; the court says nothing about such statements after he was in the prone restraint. Viewing the facts in the light most favorable to Mr. Teetz, as we must at this stage, we assume that no further death threats were made after Mr. Lofton was moved into the prone position, and thus he was not physically or verbally resisting.

Even if the district court's factual findings included that Mr. Lofton made death threats later in the encounter, however, the use of force would still be clearly excessive. Importantly, our analysis in *Weigel* and *Booker* considered the suspect's ability to *physically* resist. *See Weigel*, 544 F.3d at 1152 (observing suspect did not pose a threat once he was "on his stomach with pressure imposed on his upper back," "handcuffed," "his feet were bound," and a bystander "was lying across his legs," despite continuing to struggle); *Booker*, 745 F.3d at 424 (holding placement of 142.5 pounds of weight on suspect when he was "handcuffed on his stomach" constituted as "substantial or significant" weight on a "subdued and/or incapacitated suspect").

40

Indeed, Mr. Lofton's verbal threats—without more—would not increase the risk of harm to the officers such that the use of force would become reasonable under *Graham*. *See Lynch*, 786 F. App'x at 779–80, 782 (holding *Weigel* and *Booker* clearly established constitutional violation in case in which suspect "continuously hurled" insults at the officers after he was restrained). Here, Mr. Lofton's arms were restrained by two Defendants, Mr. Lofton was prone and shackled at the legs, and he was pinned down by multiple Defendants, including at least one who put significant pressure on his back. Thus, Mr. Lofton was similarly, if not more, restrained as the suspects in *Weigel* and *Booker*. A reasonable officer would have been on notice that continued application of pressure after Mr. Lofton was subdued created a serious risk of asphyxiation and death, even if he was still verbalizing threats. Under those circumstances, it is clearly established that a continued prone restraint is unconstitutional.

Because the constitutional violation is clearly established, Defendants are not entitled to qualified immunity.

## V.   CONCLUSION

We lack jurisdiction over Defendants' appeal to the extent they ask this court to review the district court's factual findings. We exercise jurisdiction over Defendants' challenges to abstract issues of law but hold the district court did not err in denying Defendants' qualified immunity. Accordingly, we AFFIRM the district court's denial of Defendants' motion for summary judgment, and we REMAND to the district court for proceedings consistent with this decision.

41