**PUBLISH**

FILED
United States Court of Appeals
Tenth Circuit

August 5, 2025

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

MARTHA ELLIS,

    Plaintiff - Appellee,

v.

SALT LAKE CITY CORPORATION, a
political subdivision of the State of Utah;
KARL LIEB, an individual; BRIAN
DALE, an individual; ROBERT
MCMICKEN, an individual,

    Defendants - Appellants.

No. 23-4059

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:17-CV-00245-JNP-JCB)**

_____

Katherine R. Nichols, Senior City Attorney, Salt Lake City Corporation, Salt Lake City,
Utah, for Defendants-Appellants.

Luke Rosseel, Rosseel Law, Berlin, Massachusetts, for Plaintiff-Appellee.

_____

Before **MORITZ**, **MURPHY**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

    Defendants-Appellants Karl Lieb, Brian Dale, and Robert McMicken

("Defendants") filed this interlocutory appeal, seeking qualified immunity in this

civil-rights suit against them.  Plaintiff-Appellee Martha Ellis claims the Defendants, her supervisors at the Salt Lake City Fire Department, each (1) discriminated against her on the basis of her sex and (2) harassed her because of her sex and created a hostile work environment.  Ellis sued the Defendants[1] under 42 U.S.C. § 1983, alleging violations of her Fourteenth Amendment right to equal protection of the laws.

The Defendants unsuccessfully moved for summary judgment.  On appeal, they argue that the district court should have held that qualified immunity shields them from liability on these claims.

We dismiss this appeal in part for lack of jurisdiction, and we vacate and remand in part.  As for Ellis's sex discrimination claim, the Defendants have not shown that the district court decided whether they are entitled to qualified immunity on that claim.  We thus lack collateral-order jurisdiction to review their arguments on that claim.  We also lack interlocutory jurisdiction to review most the Defendant's arguments relating to Ellis's hostile work environment claim.  The Defendants challenge the district court's facts—they say the court erred in admitting certain evidence and made findings that are blatantly contradicted by the record.  But we hold that questions of admissibility are not the sort of legal questions that are

---

[1] Ellis also sued the Salt Lake City Corporation.  The City asks us to exercise pendent interlocutory jurisdiction over its interlocutory appeal challenging the denial of its summary judgment motion.  But given our resolution of the Defendants' appeal and the City's arguments in support of pendent jurisdiction, we decline to exercise pendent jurisdiction over the City's appeal.

2

sufficiently separable from the merits so as to fall within our narrow interlocutory jurisdiction. And the Defendants have failed to meet their high burden to show any facts are "blatantly contradicted" by the record. We therefore lack jurisdiction over their (many) factual arguments. Within our jurisdiction, however, the Defendants persuade us that the district court engaged in too cursory an analysis on the second prong of qualified immunity on the hostile work environment claim. Accordingly, we remand that issue to the district court for further consideration.

## I.

In "reviewing the denial of a summary judgment motion asserting qualified immunity, we lack jurisdiction to review the district court's conclusions as to what facts the plaintiffs may be able to prove at trial."[2] *Fancher v. Barrientos*, 723 F.3d 1191, 1194 (10th Cir. 2013). "We therefore quote the district court's account of the facts pertinent to the issues raised on appeal." *Sawyers v. Norton*, 962 F.3d 1270, 1275 (10th Cir. 2020) (citing *Fancher*, 723 F.3d at 1194).

> Martha Ellis joined the Salt Lake City Fire Department ("SLCFD" or the "Department") as a firefighter in 1994. Thereafter, she quickly moved up the ranks. In 2004, she was promoted to Fire Captain and served as the Fire Marshal for the Salt Lake City International Airport. In 2009, she was promoted to Battalion Chief and assigned the prestigious posts of City Fire Marshal and Fire Prevention Bureau Division Chief. She served in this capacity until 2014. As Ellis progressed through the Department, she collected accolades and acclaim. In addition to her associate degree in fire science, she earned a master's degree in national security studies from the Naval Postgraduate School, a fellowship to study at the Harvard Kennedy School's Senior Executives in State and Local Government Program, and a graduate certificate in conflict resolution and mediation from the University of Utah. She was also the most decorated female officer

---

[2] There are narrow exceptions to this rule, but none applies here.

in a fire department sorely lacking women in leadership roles. Ellis received a Golden Spanner Award in 1996, a Chief's Certificate of Merit in 2005, and the Chief's Recognition Medal in 2011.

In late 2013, Deputy Chief Brian Dale became Ellis's direct supervisor. Dale quickly set up a meeting with Ellis to discuss his expectations for their relationship. At this meeting, Dale allegedly made a "comment about taking [disgruntled employees] outside the office or something along those lines and handing them a tampon." He also referred to a female dispatcher as a "mean ass, crazy police b*tch," and a female accountant for the City as a "b*tch."

Within several weeks of their initial meeting, Dale began criticizing Ellis's alleged lack of adherence to the chain-of-command. Specifically, in an email exchange, Dale complained to Ellis that she was bypassing him to discuss issues directly with the Chief of the Department, Kurt Cook . . . . At this time, Cook and Ellis were personal friends. The next day, January 10, 2014, Dale and Ellis met to discuss Ellis's insubordination. Unbeknownst to Dale, [Ellis] recorded their conversation, as she often did with other men in the Department. At the meeting, Ellis agreed to include Dale on emails to Chief Cook going forward and the conversation moved on to Ellis's strained relationship with the City's grant writer. Responding to Ellis's frustration with the grant writer, Dale stated that "Sarah [the employee] can be a real b*tch." Ellis responded, "But you know what? The b*tchier the women, the more I actually like 'em. I mean I love Mary Beth. I really like working with her." [Ellis] also testified that during the conversation, Dale made a comment about throwing tampons at employees and that she made it clear to Dale that his comments were offensive and unwanted. [Ellis] does not deny that she has used the words "b*tch," "b*tchy," or "b*tchier," but she maintains that she has never used them in a way that was hostile towards women.

On February 6, 2014, Dale issued [Ellis] a written warning, allegedly to address [Ellis]'s flagging performance due to her disregard for the Department's chain-of-command. While Dale maintained that this warning was not disciplinary, Ellis believed that the warning was "a marker being placed in [her file] in the hopes of keeping [her] from ever getting promoted again." Later that month, Dale met with [Ellis] and the Department's HR consultant, Jennifer Sykes [ ], to discuss the warning. During this meeting, Dale complained about Ellis's leadership, her supervision of subordinates, and her communication with individuals both inside and outside of the Department. Dale and Ellis also engaged in the following exchange when Dale attempted to encourage [Ellis] to better connect with lower-rank Fire Captains:

4

Dale: We talked about relationships. We talked about I want you to get out there in front. Talked about at the grass[root] level, this is what you can do. As a captain, this is what I'm seeing — boom, boom, boom — this is how you do it. "God, she can do it. If a girl can do it, I mean —" You know how guys are out there. If we sit up here in the ivory tower and talk above their heads—

[Ellis]: [Laughs] Yeah, he just said that. [Laughs]

Sykes: [Inaudible]

Dale: I just—I just—You know—I don't want the guys to think that you're — that you and I are just miserable day workers. I think there is some value in getting in there with those guys and being able to talk to 'em and understanding what they're going through. That's all.

[Ellis]: All right.

Ellis wrote and submitted a response to Dale's written warning, as was her right, arguing that the allegations contained in the warning were false. She also detailed specific instances in which she was subject to verbal abuse and discrimination by members of the Department. In her deposition, [Ellis] testified that she believed the written warning was a result of gender discrimination for the following non-exhaustive reasons:

1. She "did not feel like [she had] had any formal coaching or counseling, nor did [she] feel like any of that was documented. [She] felt like it was a blind side. [She] literally had no idea this was coming."
2. Dale instructed her to issue a written warning to a female employee regarding e-cigarettes after she had received a verbal warning, which Ellis believed was trivial. Dale did not request that she write up men for similar violations. This led her to believe that the women in the SLCFD "were taking a hit at this point."
3. Dale's comment that "If a girl can do it, I mean—' You know how guys are out there."
4. She had previously been written up for things that "kind of don't make a lot of sense."
5. "[G]uys would keep getting the get-out-of-jail-free cards and, you know, the rules were different for the women."

Ellis also believed that the warning was retaliatory because she had previously complained about the sexist behavior of men in the Department to Melissa Green [ ], the City's EEO manager. . . . [Ellis] thought that

5

"there weren't a lot of [other] explanations for why all of the sudden it really felt like those micro aggressions had now transferred into a full court press."

On September 30, 2014, Chief Cook promoted Robert "Rusty" McMicken to the position of Administrative Assistant Chief. Ellis had hoped to receive this promotion. . . . Despite McMicken's similar rank to Ellis in 2014 [and their similar work history at the Department], she believed that he was less qualified than she based on her "extraordinary efforts to get additional training," her "much broader understanding of the fire department as a whole," her work at the "national level," and her recently obtained degree in national security studies.

Soon after learning that she would not receive the promotion to Assistant Chief, Ellis requested to meet with Chief Cook regarding the decision. Cook invited Dale and Karl Lieb, a Deputy Chief of the Department, to the meeting, explaining to Ellis that he operated "as one" with Dale and Lieb. At the meeting, [Ellis] stated that she believed that the decision not to promote her had "a bit to do with, um, well — I think the fact that I'm a woman has something to do with it. I will throw that out there." . . . [D]uring the meeting, Lieb explained that Ellis was not promoted, in part, because he believed that she was not "humble enough." In response to this criticism, [Ellis] contends that there were "several times in [her] interview when [she] actually own[ed] up to [her] mistakes."

In October 2014, Cook removed [Ellis] from her position as Fire Marshal and appointed her as the new Division Chief of Logistics. While her rank, pay, and benefits did not change, Ellis interpreted her transfer as a demotion because her responsibilities were reduced. . . .

On November 24, 2014, [Ellis] filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Ellis's Charge indicated that the Department had discriminated and retaliated against her because of her gender. It alleged that Dale had singled her out for punishment and made several derogatory comments towards her and other women in the Department based on their gender. It also complained that she was unjustly passed over for promotion multiple times and reassigned to a lesser position against her will. On March 16, 2015, Ellis sent a letter to the EEOC updating this Charge. Her amendment focused on the conduct of her new supervisor, Assistant Chief McMicken. Ellis claimed that since the filing of her initial Charge, McMicken had denied her networking opportunities, unjustifiably scrutinized her performance, and made defamatory statements about her work.

6

On April 27, 2015, McMicken delivered a pre-determination letter to Ellis. The letter informed her that he was considering disciplinary intervention because she was exhibiting "an apparent lack of engagement with [her] current assignment, a lack of ownership of [her] job responsibilities, an inability to follow instructions[,] and a lack of respect for [her] chain of command." The Department eventually held a hearing on this complaint in June 2015, after which McMicken decided to suspend Ellis for two days.

On April 7, 2015, Cook announced his retirement, effective April 30, 2015. On April 28, 2015, two days before Cook was to step down, [Ellis] sent an application for the Fire Chief position to Mayor Ralph Becker. At this point, Mayor Becker had not formally posted a call for applications. In response to her application, the Mayor's Chief of Staff, David Everitt [ ], informed Ellis that Mayor Becker had already selected a new Fire Chief. Upon hearing this news, [Ellis] offered to speak with the Mayor about the EEOC Charge pending against the Department's leadership— the very set of individuals who she assumed had been considered for Fire Chief. Everitt declined the invitation, stating that he believed a direct meeting with the Mayor was "not advisable" since Ellis's Charge was also pending against the City.

On May 4, 2015, the Mayor announced that Dale was to become the new Fire Chief. His tenure would be a short one because audio of his use of gendered language was leaked to the press. Everitt later testified that [Ellis] was not a serious contender for the role of Fire Chief . . . because[, among other things,] she was "in some cases abrasive and off putting in others . . . and just broadly did not seem to have the level of respect and trust that someone in that role should have had for the city."

In response to both McMicken's discipline and Dale's promotion, [Ellis] once again amended her EEOC Charge. In a letter to the EEOC dated May 5, 2015, Ellis alleged that McMicken's unwarranted complaints and controlling behavior had reached the point where they constituted a hostile work environment. She also argued that the reason she had been issued a pre-determination notice in April was to prevent her from being considered for the Fire Chief position that eventually opened that May.

On May 22, 2015, [Ellis] sent the Department's EEO Manager, Green, an e-mail with allegations regarding Cook, Dale, Lieb, McMicken, Human Resources Director Debra Alexander, and Sykes. Thereafter, four Department employees submitted evidence supporting Ellis's claim that members of the Department's leadership team, specifically Dale, regularly used sexist language. On August 3, 2015, Captain Steve Hoffman

7

[ ] told Green that Dale had said on multiple occasions that "he did not like [Battalion Chief] Ellis," that he "wrote her up" and was "finally going to hold her accountable," and that he "really hate[d] that b*tch." On August 31, 2015, Brittany Blair [ ] told Green that she witnessed a meeting with Dale, Lieb, and McMicken where Dale called Ellis "a b*tch." On October 20, 2015, Sarah Bohe [ ] spoke with Green and stated that while Dale was describing projects that he was working on, he had said, "Oh that f*cking b*tch is making it so hard," referring to Ellis. And on November 2, 2015, Crystal VanDongen [ ] spoke with Green and alerted her to the fact that she "had been discriminated against based on [her] gender, been subjected to a hostile work environment and been retaliated against based on [her] affiliation with Battalion Chief Martha Ellis." VanDongen explained to Green that she had heard Dale refer to several women as b*tches. Additionally, she alleged that McMicken and Lieb had made offensive comments regarding women.

Green prepared a 24-page report detailing her findings and, on November 18, 2015, determined that the available evidence did not support [Ellis]'s allegations that she was disciplined, transferred, treated differently, or not promoted based on her gender. It also found that the allegations against Dale were insufficiently supported to substantiate a policy violation even though several members of the Department had come forward to complain that Dale had used misogynistic language to refer to Ellis and other women in the Department.

In January 2016, the Department promoted Clair Baldwin ("Baldwin") to Assistant Chief of Operations. [Ellis] had hoped to receive this promotion. . . .

On March 16, 2016, McMicken issued Ellis a second pre-determination notice. This notice informed Ellis that McMicken had once more observed a "a pattern of performance" that caused him "to question [her] ability to effectively manage and perform [her] job duties." By this time, McMicken was certainly aware that Ellis had filed an EEOC complaint against him. On April 11, 2016, the City held a pre-determination hearing regarding Ellis's job performance, and on May 3, 2016, she was demoted to Captain. . . .

On May 13, 2016, [Ellis] requested Family Medical Leave Act ("FMLA") leave . . . . While on FMLA leave, [Ellis] once more amended her EEOC Charge. In this final letter to the EEOC, dated July 8, 2016, Ellis detailed the ongoing alleged discrimination and retaliation that she was experiencing, naming McMicken, Lieb, and Dale as the primary culprits. In addition to continuing to attempt to redress her situation through the EEOC

8

process, [Ellis] also turned to the Salt Lake City Civil Services Commission ("CSC") for relief. The CSC had the power to determine whether City agencies had violated the City's employment policy. At some point during her leave, Ellis submitted an appeal of her May 2016 demotion to this body. . . .

While Ellis was on leave . . . , her CSC appeal moved forward. In early February 2017, the CSC held a two-day hearing to determine the outcome of the appeal. Ellis, McMicken, and representatives of the SLCFD were all present and represented by legal counsel. Each side called witnesses to offer testimony on direct and cross-examination. On March 18, 2017, the three member CSC met and unanimously voted to overturn and reverse Ellis's demotion. The CSC ultimately found that:

1. "McMicken was looking for reasons to discipline Ellis."
2. "[A]llegations of Ellis'[s] lack of performance are not supported by substantial evidence."
3. The reasons for Ellis's demotion were "trivial in nature."
4. The "allegations appear to the Commission to be an attempt to manufacture misconduct and allege failure of performance to justify the disciplinary action, when there were no performance issues."

App'x Vol. VI at 1530–44 (citations and footnote omitted).

As relevant here, the Defendants moved for summary judgment on Ellis's § 1983 sex discrimination and hostile work environment claims. The district court denied the motion. The Defendants timely filed this interlocutory appeal.

## II.

### A.

Public officials sued under § 1983 in their individual capacity for damages may invoke the defense of qualified immunity. *Duda v. Elder*, 7 F.4th 899, 909 (10th Cir. 2021). We must grant qualified immunity unless the plaintiff shows that (1) the official violated a constitutional or statutory right which (2) was clearly established at the time of the official's conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

**B.**

We have appellate jurisdiction over "final decisions of the district courts of the United States."  28 U.S.C. § 1291.  "Ordinarily, an order denying summary judgment is not a 'final decision' within the meaning of § 1291."  *Fancher*, 723 F.3d at 1198.  "Under the collateral order doctrine, however, a circuit court may review certain orders as appealable final decisions within the meaning of [ ] § 1291 even though the district court has not entered a final judgment."  *Henderson v. Glanz*, 813 F.3d 938, 947 (10th Cir. 2015) (citation omitted).

Under the collateral order doctrine, we "have interlocutory jurisdiction over a subset of appeals from the denial of qualified immunity at the summary judgment stage."  *Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 753 (10th Cir. 2013).  "[W]e have jurisdiction to review a denial of qualified immunity" "[t]o the extent an appeal turns on an abstract issue of law."  *Id.*; *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  Specifically, we have interlocutory jurisdiction "to review '(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation.'"  *Roosevelt-Hennix*, 717 F.3d at 753 (quoting *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1267 (10th Cir. 2013)).  These two "abstract *legal* question[s]" are "completely separate from the merits" such that they fall within our collateral-order jurisdiction.  *Allstate Sweeping*, 706 F.3d at 1267 (quotation omitted).  In contrast, we "generally lack[] jurisdiction to review factual disputes in

this interlocutory posture." *Teetz ex rel. Lofton v. Stepien*, 142 F.4th 705, 718 (10th Cir. 2025) (quotation omitted).

## C.

"Insofar as we have jurisdiction to review the denial of a qualified-immunity motion for summary judgment, our review is de novo." *Deutsch v. Jordan*, 618 F.3d 1093, 1099 (10th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Sawyers*, 962 F.3d at 1282 (quotation omitted).

## III.

The Defendants solicit our interlocutory jurisdiction and ask us to direct the district court to grant them qualified immunity on both Ellis's (1) hostile work environment claim and (2) sex discrimination claim. Their appeal of that second claim, however, fails at the first collateral-order doctrine hurdle.

The first barrier to invoking our jurisdiction under the collateral order doctrine is establishing that "the district court's order [ ] conclusively determined the disputed question." *Henderson*, 813 F.3d at 947 (quotation omitted). "When considering whether a district court has conclusively determined the disputed question, this court has emphasized the importance of precisely identifying that question." *Abrogast v. Kan., Dep't of Lab.*, 789 F.3d 1174, 1180 (10th Cir. 2015).

11

We have bright line rules on this front in the qualified immunity context. "[I]f the district court explicitly decided the qualified immunity question, we will usually have jurisdiction over the interlocutory appeal." *Montoya v. Vigil*, 898 F.3d 1056, 1063 (10th Cir. 2018). The same goes when a defendant "explicitly raised the defense" of qualified immunity before the district court but the district court fails to expressly decide the qualified immunity question, because we consider the district court's silence to "operate as an implicit denial" of qualified immunity. *Id.* at 1063–64. But "[i]f the defendant did not expressly raise the defense," and the district court does not address the defense, "we cannot interpret the district court's silence as an implicit denial of qualified immunity . . . . And that means there is no decision denying qualified immunity for us to review." *Id.* at 1064. In other words, we will consider the district court's order to have conclusively determined the qualified immunity question only when (1) the defendant raises qualified immunity, (2) the district court explicitly rules on qualified immunity, or (3) both. *See id.* at 1063–64.

Here, we only have a qualified immunity decision to review on Ellis's hostile work environment claim. On this claim, the Defendants have shown that they explicitly raised the qualified immunity defense at summary judgment, *see* App'x Vol. II at 302–03, and the district court's summary judgment order explicitly rejected that defense, *see* App'x Vol. VI at 1583–85.

But there is no qualified immunity decision to review on Ellis's sex discrimination claim. As to that claim, the Defendants have shown neither that they expressly raised the qualified immunity defense at summary judgment nor that the

district court directly decided it in its summary judgment order. The term "qualified immunity" does not appear in the Defendants' summary judgment briefing on Ellis's sex discrimination claim. *See* App'x Vol. II at 303–12. The Defendants' only argument was that Ellis's claim failed on the constitutional merits because she could not show that she suffered sex discrimination. *See id.* Unsurprisingly, the district court's discussion of Ellis's sex discrimination claim in its summary judgment order does not use the term "qualified immunity" at all, either. *See* App'x Vol. VI at 1561–75. The court, following the Defendants' lead, considered only the constitutional merits of this claim. *See id.*

It is no matter that the first prong of the qualified immunity analysis asks whether the plaintiff has shown a constitutional violation. *See Pearson*, 555 U.S. at 239. Merely raising the argument that the plaintiff has failed to meet her burden (whatever it may be at a given procedural posture) to show a constitutional violation, but failing to specifically mention qualified immunity, "is insufficient to raise qualified immunity." *Montoya*, 898 F.3d at 1065 (discussing this at the Rule 12(b)(6) stage); *see also Berryman v. Niceta*, --- F.4th ----, No. 23-1263, 2025 WL 1872778, at *4 (10th Cir. July 8, 2025). This is because "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim." *Mitchell*, 472 U.S. at 527. Because a "defendant must raise the qualified immunity defense" at summary judgment to benefit from the shield it affords, *see Woodward v. City of Worland*, 977 F.2d 1392, 1396 (10th Cir. 1992), the argument that a plaintiff fails to raise a genuine dispute of material fact as to whether her constitutional rights were violated, standing alone,

13

falls short of explicitly raising a qualified immunity defense. Such a naked constitutional merits argument "fails to notify either the district court or the plaintiff that the defendant is invoking qualified immunity—with all its attendant complexity and possibility for interlocutory appeal." *See Montoya*, 898 F.3d at 1065. And it follows that a district court merely deciding whether there is a triable issue on the constitutional merits is not the court "explicitly decid[ing] the qualified immunity question." *See id.* at 1063.

In sum, the Defendants want us to answer (in the affirmative) the question of whether they are entitled to qualified immunity on Ellis's sex discrimination claim, but they have not shown "that the district court's order [ ] conclusively determined th[at] disputed question." *Henderson*, 813 F.3d at 947 (quotation omitted). As a result, they have failed to establish our collateral-order jurisdiction on this claim. We thus dismiss the Defendants' interlocutory appeal on Ellis's sex discrimination claim for lack of jurisdiction.

**IV.**

We proceed with the Defendants' arguments on the sole remaining claim, Ellis's hostile work environment claim. Almost exclusively, the Defendants ask us to review factual disputes beyond our interlocutory jurisdiction, and we dismiss this appeal to the extent the Defendants raise such arguments. But the Defendants do identify a legal infirmity in the district court's resolution of one of the qualified immunity prongs that, in these circumstances, requires a limited vacatur and remand.

14

**A.**

As a rule, we lack interlocutory jurisdiction to review "the district court's conclusions as to what facts the plaintiffs may be able to prove at trial" or "whether the plaintiff's evidence is sufficient to support a particular factual inference." *Duda*, 7 F.4th at 909 (citation modified); *see Fancher*, 723 F.3d at 1194, 1199; *Teetz*, 142 F.4th at 718. This jurisdictional limitation flows from the Supreme Court's decision in *Johnson v. Jones*, 515 U.S. 304 (1995), which, to use its terms, leaves us without interlocutory jurisdiction to review "question[s] of 'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial," or "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 313, 320; *see Allstate Sweeping*, 706 F.3d at 1267. *Johnson* indicates that, "at the summary judgment stage at least, it is generally the district court's exclusive job to determine which *facts* a jury could reasonably find from the evidence presented to it by the litigants." *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (Gorsuch, J.). "So, for example, if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has indicated we usually must take them as true—and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law." *Id.* In other words, under *Johnson*, we have interlocutory jurisdiction to review only the materiality of any factual disputes, but not the genuineness of those disputes. *See Walton v. Powell*, 821 F.3d 1204, 1209 (10th Cir. 2016) (Gorsuch, J.).

15

"A 'narrow' exception to this jurisdictional limitation exists where 'the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record.'" *Teetz*, 142 F.4th at 719 (quoting *Clerkley v. Holcomb*, 121 F.4th 1359, 1363 (10th Cir. 2024)); *see Scott v. Harris*, 550 U.S. 372, 380–81 (2007). "Where this exception applies, we may . . . review the factual record *de novo*." *Teetz*, 142 F.4th at 719 (ellipsis in original) (brackets and internal quotation marks omitted).

But absent a narrow exception,[3] "we must scrupulously avoid second-guessing the district court's determinations regarding whether the appellee has presented *evidence* sufficient to survive summary judgment." *Sawyers*, 962 F.3d at 1281 (brackets omitted) (quoting *Fancher*, 723 F.3d at 1199). "The district court's factual findings and reasonable assumptions comprise the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity." *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (internal quotation marks omitted). Thus, to permit our review at this interlocutory posture, "the defendant must . . . be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Id.* (quotation omitted). To the extent the defendant fails to accept the district court's factual findings and reasonable inferences in crafting their appellate

---

[3] In addition to the blatant-contradiction exception, there are exceptions for when the district court "failed to identify the factual disputes" and "committed *legal* error en route to the *factual* determinations." *McWilliams v. Dinapoli*, 40 F.4th 1118, 1122 (10th Cir. 2022) (brackets and quotation omitted). The Defendants only invoke the blatant-contradiction exception here, so we need not consider the application of the others, but in any event do not find the others applicable.

16

arguments, we must dismiss the appeal for lack of appellate jurisdiction. *See, e.g.,* *Castillo v. Day*, 790 F.3d 1013, 1018–19, 1022 (10th Cir. 2015).

**B.**

To resolve their appeal, the Defendants ask us to adopt a different set of facts than the district court's.[4]  We should, the Defendants contend, because the district court "erred by relying on findings blatantly contradicted by the record and based on inadmissible evidence" in concluding that there existed genuine factual disputes sufficient to withstand summary judgment.  Aplt. Br. at 14.  The Defendants ask us to ignore the purportedly contradicted findings and the allegedly inadmissible evidence in deciding whether they are entitled to qualified immunity.

We are not convinced.  Going in reverse order, we first hold that we lack jurisdiction to review the Defendant's evidentiary objections at this interlocutory posture.  Second, we hold that none of the Defendants has raised a viable argument that any factual finding relating to them is blatantly contradicted by the record.

**1.**

The Defendants take issue with the district court's reliance on the CSC's March 18, 2017 written decision overturning and reversing Ellis's demotion ("CSC Decision") in denying them qualified immunity.  The CSC Decision, the Defendants say, "was the primary piece of evidence" on which the court relied to deny them

---

[4] For ease of exposition, we generally refer to all of the district court's assumed facts—both the court's own factual findings and its findings of what facts a jury could reasonably infer and find—as the district court's "facts" or "findings." *See Clerkley*, 121 F.4th at 1363 n.4.

17

summary judgment. Aplt. Br. at 15. But the Defendants argue that the CSC Decision "was inadmissible and should not have been considered." *Id.* at 16. Primarily, the Defendants aver that the CSC Decision is inadmissible hearsay.[5] *Id.* at 16–19. Based on the arguments before it at summary judgment, however, the district court held that the CSC Decision was admissible.

Ellis asserts that the Defendants' evidentiary challenge is "beyond the scope of this court's jurisdiction" on interlocutory appeal. Aple. Br. at 64. The Defendants chiefly counter that we have interlocutory appellate jurisdiction "to consider legal questions related to the denial of qualified immunity, and the admissibility of evidence is just such a legal question." Reply Br. at 2. We agree with Ellis.

We previously have "question[ed] whether we have jurisdiction under *Johnson* to review . . . rulings regarding the admissibility of evidence" at this interlocutory posture. *Stella v. Anderson*, 844 F. App'x 53, 58 (10th Cir. 2021) (unpublished).[6] With the issue squarely before us here, we hold that evidentiary objections are beyond the scope of our interlocutory jurisdiction. "Questions of admissibility are indeed legal questions; but they are not the sort of legal questions that are sufficiently

---

[5] The Defendants also argue that the CSC Decision is excludable under Federal Rule of Evidence 403 and "is replete with double hearsay." *Id.* at 19–24. But the Defendants waived these objections because their opening brief fails to provide the precise references in the record where those distinct issues were raised and ruled on in the district court. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). Even if these objections were not waived, though, we would lack jurisdiction to consider them at this interlocutory posture for the reasons we set forth in this section.

[6] Unpublished cases are not binding precedent, but we consider them for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

separable from the merits so as to provide us with jurisdiction in a collateral-order appeal." *Whitlock v. Brueggemann*, 682 F.3d 567, 575 (7th Cir. 2012).  A district court's admissibility determinations are part of its determination that a genuine fact dispute exists—that is, a determination about "which facts a party may, or may not, be able to prove at trial"—something not so separable from the merits.[7] *See Johnson*, 515 U.S. at 313; *see also Allstate Sweeping*, 706 F.3d at 1267 ("To be completely separate from the merits, . . . the qualified-immunity issue raised on appeal must be an abstract *legal* question . . . . [W]hether or not the pretrial record sets forth a genuine issue of fact for trial is not an abstract legal question." (brackets and internal quotation marks omitted)).  We thus agree with our sister circuits that have held that "[t]he admissibility of [evidence] is not within the limited scope of our appellate jurisdiction on [ ] interlocutory appeal." *Locke v. Haessig*, 788 F.3d 662, 672 n.4 (7th Cir. 2015); *see Bridges v. Morgan*, No. 21-12425, 2022 WL 342905, at *3 (11th Cir. Feb. 4, 2022) (unpublished) (per curiam) ("[The] argument [that evidence

---

[7] Our cases recognize an exception to *Johnson*'s rule where "the district court commits *legal* error en route to a *factual* determination." *Sawyers*, 962 F.3d at 1281 n.10 (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1232 (10th Cir. 2013)).  That is, we have said there is an exception for where a "factual determination is predicated on an erroneous legal conclusion." *Pahls*, 718 F.3d at 1232.  But legal errors regarding the admissibility of evidence do not fit within this exception.  We have made clear that the legal errors this exception contemplates are those regarding legal standards that, one way or another, govern how the fact-finder is to find facts. *See Teetz*, 142 F.4th at 722 (holding this exception only applies where an appellant "identifie[s] a legal error the district court made at the outset that caused it to fail to make necessary factual findings or view the facts through an erroneous legal framework").  Issues of admissibility relate only to what evidence is available to the fact-finder to find facts or draw factual inferences; the decision as to whether evidence is admissible does not control how the fact-finder is to view that evidence.

is inadmissible] is not one we have interlocutory jurisdiction to review since it merely concerns the facts a party may, or may not, be able to prove at trial. Whether the court erred in determining the admissibility of certain evidence does not go to core qualified immunity issues; that is, it does not concern the application of established legal principles to a given set of facts. That the evidentiary issue arose in the context of qualified immunity is not enough." (citations and internal quotation marks omitted)); *see also Ellis v. Washington County*, 198 F.3d 225, 229 (6th Cir. 1999) (holding there was no jurisdiction under *Johnson* to review whether denial of summary judgment was based on inadmissible hearsay even though "the only factual dispute in th[e] case ar[ose] from the rankest type of inadmissible hearsay").[8]

The Defendants alternatively ask us to exercise our pendent jurisdiction to entertain their evidentiary arguments. We decline the invitation.

---

[8] At least the Fifth and Eighth Circuits disagree. The Fifth Circuit's rule is that, on an interlocutory qualified immunity appeal, it has jurisdiction over challenges to the admissibility of evidence, but "only to evidence that is 'critical' to the district court's denial of a summary judgment motion." *Juarez v. Aguilar*, 666 F.3d 325, 333 (5th Cir. 2011) (citing *Mersch v. City of Dallas*, 207 F.3d 732, 734–35 (5th Cir. 2000)). But the Fifth Circuit has also recognized the tension between its rule and that of *Johnson*, noting that admissibility issues "arguably involve[] the district court's assessment of the facts established by or inferable from the evidence." *See Hardesty v. Cochran*, 621 F. App'x 771, 777 n.30 (5th Cir. 2015) (unpublished) (per curiam) (internal quotation marks omitted). The Eighth Circuit has also reviewed evidence admissibility on interlocutory qualified immunity review, deeming admissibility "a purely legal issue" within its jurisdiction, but without considering the *Johnson* difficulty. *See Glaze v. Byrd*, 721 F.3d 528, 532–33 (8th Cir. 2013). We agree with the Eighth Circuit that admissibility is a legal issue, but we also agree with the Seventh Circuit that admissibility is not the sort of legal issue "sufficiently separable from the merits so as to provide us with jurisdiction in a collateral-order appeal." *Whitlock*, 682 F.3d at 575.

"Pendent appellate jurisdiction is a narrow extension of this court's jurisdiction." *Heard v. Dulayev*, 29 F.4th 1195, 1207 (10th Cir. 2022) (citation modified). Pendent jurisdiction is also "discretionary and disfavored in qualified-immunity appeals." *Wise v. Caffey*, 72 F.4th 1199, 1202 n.2 (10th Cir. 2023).

We have said that "pendent appellate jurisdiction might [ ] be appropriate . . . where review of the nonappealable decision is necessary to ensure a meaningful review of the appealable one." *Heard*, 29 F.4th at 1207 n.9 (quotation omitted). That is the alternative jurisdictional basis the Defendants propose here. They argue the question of whether the CSC Decision "is admissible is necessary to ensure a meaningful review of the appealable qualified immunity question," because "the CSC Decision was the primary and often only evidence the district court cited" in denying summary judgment. Reply Br. at 2. But by the Defendants' logic, one could argue that we ought to exercise pendent jurisdiction over all factual determinations simply because the district court relied heavily upon those facts in denying qualified immunity. We cannot accept such an argument, "lest we swallow the rule of *Johnson*," *see Fogarty v. Gallegos*, 523 F.3d 1147, 1154 n.7 (10th Cir. 2008), and offend the rationale behind pendent jurisdiction's disfavor, *see Cummings v. Dean*, 913 F.3d 1227, 1235 (10th Cir. 2019).

With no interlocutory jurisdiction to entertain the Defendants' evidentiary objections, the Defendants must accept the district court's CSC Decision-based factual findings in their qualified immunity arguments, absent some applicable exception to *Johnson*'s rule.

21

**2.**

Lieb and Dale argue for de novo review of the factual record under the blatant-contradiction exception, each taking issue with two of the district court's factual findings.[9]  But they have failed to demonstrate that this is one of the rare cases where this exception applies.

**i.**

The blatant-contradiction "standard is a very difficult one to satisfy."  *Teetz*, 142 F.4th at 719 (quotation omitted); *see Roosevelt-Hennix*, 717 F.3d at 759 (stressing "the limited nature" of the exception).  The standard is satisfied only when "the version of events is so utterly discredited by the record that no reasonable jury could have believed" it, constituting "visible fiction."  *Scott*, 550 U.S. at 380–81. Defendants thus cannot establish a blatant contradiction by just pointing to evidence that "strongly supports [their] position," *Cordero v. Froats*, 613 F. App'x 768, 769 (10th Cir. 2015) (unpublished), but must instead point to evidence that completely and "indisputably contradicts" the challenged factual finding, *Finch v. Rapp*, 38 F.4th 1234, 1241 (10th Cir. 2022).  Accordingly, there is no blatant contradiction "where

---

[9] McMicken also appears to take issue with two factual findings, but he fails to adequately brief a challenge to either, and so he has waived his objections to both. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").  McMicken challenges one of the findings in just one sentence, with little reasoning.  *See Defs. of Wildlife v. U.S. Forest Serv.*, 94 F.4th 1210, 1227 n.10 (10th Cir. 2024) (finding one-sentence argument waived).  McMicken challenges the other only in a footnote.  *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

[the] evidence could plausibly support two competing versions of events." *Teetz*, 142 F.4th at 720. Likewise, where the "evidence is consistent with a plaintiff's version of events, even if that evidence is inconclusive, it does not qualify for the blatant contradiction exception." *Id.* at 721 (internal quotation marks omitted).

**ii.**

We start with Lieb. He first contests the district court's finding that he "demeaned [Ellis] using a sexist trope by telling her she was not receiving a promotion due to her lack of humility." App'x Vol. VI at 1580 n.25. Lieb bases his blatant-contradiction argument solely on an audio recording of his statement,[10] which, in his view, shows that he "was not making a sexist statement or requiring a contrary set of expectations for women; he had the exact same expectation of humility for male and female candidates." Aplt. Br. at 14–15.

The district court, however, did not base its "sexist trope" finding solely on Lieb's exact words. The district court found such a conclusion permissible based on other findings the court made from parts of the record depicting, among other things, the overall environment of the Department vis-à-vis the treatment of women and the expectations for men in the Department. Because Lieb does not challenge those parts of the record, on which the district court predicated its "sexist trope" finding, Lieb

---

[10] Contrasting the male selected candidate and Ellis, Lieb said: "A big factor for me, is he had some humility. He recognized his weaknesses, he spoke about them. Now, I didn't hear a lot of that in the interview with you. You had an opportunity to speak to it." App'x Vol. III at 767, 54:27–41.

has necessarily failed to demonstrate that this finding is "utterly discredited by the record." *See Scott*, 550 U.S. at 380.

Lieb next contests the district court's finding that "the CSC Decision found Lieb was part of a 'triumvirate' that removed [Ellis] from executive roles, denied her promotions, and demoted her without cause." App'x Vol. VI at 1580 n.25. Lieb argues that this finding is blatantly contradicted by the CSC Decision itself, because, he says, the CSC Decision "made absolutely no findings about [him] or his conduct." Aplt. Br. at 15.

Lieb is wrong. The CSC Decision, for example, includes findings that Lieb (but not McMicken or Dale) saw Ellis give a presentation on January 6, 2016; that Lieb said nothing to Ellis about the presentation at the time; and that McMicken two months later used that presentation as evidence of "wrong-doing that would justify demoting [Ellis]" from her role as Battalion Chief. *See* App'x Vol. IV at 1058–59; *see also, e.g.*, *id.* at 1026–27 (noting testimony from McMicken that he demoted Ellis only after receiving the approval of Lieb and Dale). From that, a jury might reason that McMicken only learned of that presentation from Lieb (again, the only one of Lieb, Dale, and McMicken to witness it). Thus, not only is Lieb wrong that the CSC Decision made "absolutely no findings about [him]" (reason enough to reject his blatant-contradiction argument), but a rational jury might view the CSC Decision to suggest that Lieb coordinated with McMicken and Dale in material ways (operating as a so-called "triumvirate"). Therefore (assuming for the sake of argument that the CSC Decision is the sort of evidence that *could* blatantly contradict this finding in the

24

first place[11]), Lieb has not convinced us that there is no way that the CSC Decision can be viewed as consistent with the district court's account. *See Teetz*, 142 F.4th at 720–21 (blatant-contradiction exception inapplicable if the "evidence could plausibly support" the plaintiff's version of events "even if that evidence is inconclusive").

**iii.**

We turn to Dale. First, he challenges the district court's finding that he "allegedly made a comment about throwing tampons at employees who were acting weak." App'x Vol. VI at 1577. Dale argues that this finding is blatantly contradicted by the record because the district court relied on Ellis's deposition testimony recounting what Dale said, but this specific comment cannot be heard on an audio recording of Dale and Ellis speaking. Generally, though, the lack of sound on an audio recording alone cannot blatantly contradict sworn testimony attesting that the facts differed from what was recorded. *See Coble v. City of White House*, 634 F.3d 865, 869–70 (6th Cir. 2011). On top of that, Dale advances no argument in the opening brief that this recording clearly captured the entirety of Ellis's and Dale's conversation(s) on the day in issue,[12] which also defeats a blatant-contradiction

---

[11] The blatant-contradiction exception "generally applies only [to] '[d]ocumentary evidence' such as videos or photographs." *Teetz*, 142 F.4th at 720 (second alteration in original) (quoting *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1164 (10th Cir. 2021)).

[12] Dale states that "the entirety of the recorded conversation was an exhibit," Aplt. Br. at 27–28, which is different than arguing (let alone pointing us to evidence showing) that the entirety of the conversation *was recorded* and was an exhibit. By

argument. *See York v. City of Las Cruces*, 523 F.3d 1205, 1210–11 (10th Cir. 2008) (blatant-contradiction exception inapplicable where audio recording captured "only part of the incident"). Dale has not convinced us that no reasonable jury could believe Ellis's version of events solely because of the lack of corroborating sound on this audio recording.[13]

Dale next faults the district court for crediting Ellis's sworn testimony that "Dale had instructed [Ellis] to issue written warnings to women in the Department for minor breaches of workplace norms, while [Ellis] was 'constantly being told [she] couldn't write [male subordinates] up and [she] couldn't move forward' with discipline" against them. App'x Vol. VI at 1579 (quoting App'x Vol. II at 483). Dale argues that this finding is blatantly contradicted by two recordings of conversations between him and Ellis. In one, Dale did not discourage Ellis from disciplining a male subordinate when she expressed frustrations with the subordinate's performance. In the other, Dale suggested that Ellis "put the heat on" a male subordinate of hers if that subordinate was not performing as he should or was advocating too much for another male subordinate. App'x Vol. III at 705, 32:46–47.

---

not squarely raising such an argument, Dale has waived it. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

[13] To be sure, an audio recording may serve to blatantly contradict a factual finding "when it is presented to show what sounds or statements were made." *Coble*, 634 F.3d at 870 n.4 (citation omitted); *accord Pierson v. Bassett*, 534 F. App'x 768, 771 (10th Cir. 2013) (unpublished) (holding plaintiff's affidavit, characterizing his behavior during traffic stop as "compliant and never argumentative," was blatantly contradicted by audio recording showing plaintiff was "tense and argumentative").

That Dale said these things in these two recorded conversations, however, does not mean that Dale never encouraged Ellis to discipline women inconsistently to how he encouraged Ellis to discipline men, or otherwise disproportionately suppressed Ellis's attempts to discipline men on other occasions. At most, the recordings Dale points to might mean that Ellis's use of the term "constantly" in her testimony was not literally accurate. *See* App'x Vol. II at 483. But these recordings do not "so utterly discredit[]" Ellis's sworn version of events, accepted by the district court, such "that no reasonable jury could believe it." *Scott*, 550 U.S. at 380.

## C.

Finally, we consider the Defendants' arguments on the merits of qualified immunity. By and large, the Defendants fail to accept the district court's facts as true. Because the Defendants have failed to establish their entitlement to our de novo review of the factual record, we lack jurisdiction over their factual disputes and dismiss their appeal to the extent they raise them.

Within our jurisdiction, however, the Defendants persuasively argue that the district court erred in how it resolved the second prong of their qualified immunity defenses—whether the law the Defendants allegedly violated was clearly established. We remand the case for the district court to have another, more thorough, go on that issue.

### 1.

The first qualified immunity prong asks whether the facts the plaintiff has shown make out a violation of a constitutional right. *See Pearson*, 555 U.S. at 239.

27

Here, the violation Ellis claims is of a right under the Fourteenth Amendment's Equal

Protection Clause to be free from a hostile work environment based on her sex.  For

purposes of this appeal, we assume without deciding that such an equal-protection-

based claim is cognizable and actionable under § 1983.[14]  *Cf. Allstate Sweeping*, 706

F.3d at 1266, 1298 (assuming race- and sex-based hostile work environment claims

could similarly be brought under § 1983).  The district court found triable questions

on whether each of the Defendants violated Ellis's (assumed) constitutional right to

be free from a sex-based hostile work environment.

On appeal, the Defendants' arguments that they did not violate Ellis's rights

either fight the district court's facts, raise evidence sufficiency issues, or both.[15]  As a

result, we lack jurisdiction to entertain any of the Defendants' arguments on this first

qualified immunity prong.

Primarily, each of the Defendants argues that the district court erred in finding

that they violated Ellis's constitutional rights while disregarding many of the district

court's facts and proposing their own re-weighing of the rest.  Each of these

---

[14] The district court observed that we have never held that such an equal-protection-based hostile work environment claim is actionable under § 1983, but the district court nonetheless ruled that such a claim is.  The Defendants do not dispute this ruling here, so we have no occasion to question it.

[15] Lieb cursorily floats one purely legal argument, but without any citation to relevant caselaw, that "it was legal error for the district court to analyze findings that [Ellis] was reassigned, not promoted, and demoted" on this claim.  Aplt. Br. at 23 (citing only one case that dealt with a statute of limitations issue).  Lieb has waived this argument by inadequately briefing it.  *See Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 n.19 (10th Cir. 2023) (finding waiver where appellant "present[ed] little argument" and "relied exclusively on [irrelevant] caselaw").

arguments—"limited to a discussion of [the defendant's] version of the facts and the inferences that can be drawn therefrom"—is beyond our interlocutory jurisdiction. *Duda*, 7 F.4th at 909–10 (alteration in original) (quoting *Castillo*, 790 F.3d at 1018).

Beyond that, the Defendants only raise impermissible evidence insufficiency arguments. Lieb and McMicken argue that Ellis's evidence shows only facially sex-neutral harassment, not harassment based on Ellis's sex. But "it is ordinarily the province of the jury," as the fact-finder, "to decide whether facially sex-neutral conduct constitutes harassment based on sex." *Delsa Brooke Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020).[16] And each of the Defendants contends that Ellis's evidence did not show that any harassment in which they engaged was "severe or pervasive." Aplt. Br. at 23, 25, 27. But "the severity and pervasiveness evaluation," too, "is quintessentially a question of fact." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quotation omitted). Because the Defendants contest questions of fact, they are arguing evidence insufficiency, and we lack jurisdiction to consider these arguments. *See Sawyers*, 962 F.3d at 1285; *Castillo*, 790 F.3d at 1021; *Stella*, 844 F. App'x at 57.

**2.**

The second qualified immunity prong asks whether the law in question was clearly established at the time of the defendant's conduct. *See Pearson*, 555 U.S.

---

[16] The parties assume that our Title VII and Title IX sex-based hostile work environment cases govern Ellis's equal-protection-rooted claim. *See* Aplt. Br. at 12–15, 23–26, 29–32 (arguing based on Title VII and Title IX caselaw); Aple. Br. at 26, 33, 35–36, 39–47 (same). For present purposes, we assume the same.

at 232. For law to be "clearly established," there need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The district court found the law here clearly established. The court's analysis, though, was terse. In very short order, the court recited the "clearly established" standard, quoted one case broadly recognizing the applicable constitutional right, rejected the Defendants' argument that it needed to find a case directly on point, and then summarily concluded: "Here, it is beyond debate that repeatedly referring to female employees as 'b*tches,' making sexist insinuations, and berating female employees for failing to meet higher standards than those applied to similarly situated men is unconstitutional." App'x Vol. VI at 1585.

The Defendants' primary contention is that the unconstitutionality of their conduct was not "beyond debate." But as a threshold matter, the Defendants argue that the district court erred in its method of answering the "clearly established" question. They assert that the court did not properly "consider the conduct of each Defendant *individually*" in its analysis or explain how the unconstitutionality of "each [ ] Defendant's *specific conduct*" was "beyond debate." Aplt. Br. at 34. We agree that the district court's "clearly established" analysis was lacking here.

As a general matter, "defendants' entitlement to qualified immunity[] turn[s] on an individual assessment of each defendant's conduct and culpability." *Pahls v. Thomas*, 718 F.3d 1210, 1233 (10th Cir. 2013). As a result, when conducting a qualified immunity analysis, "courts must consider . . . whether each defendant's

30

alleged conduct violated the plaintiff's clearly established rights." *Id.* at 1227

(quoting *Hope v. Pelzer*, 536 U.S. 730, 751 n.9 (2002) (Thomas, J., dissenting)).

On the second prong of qualified immunity, specifically, "[t]he dispositive

question is whether the violative nature of *particular* conduct is clearly established.

This inquiry must be undertaken in light of the specific context of the case, not as a

broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)

(citation modified). "To make this determination, we consider either if courts have

previously ruled that *materially similar conduct* was unconstitutional, or if a general

constitutional rule already identified in the decisional law applies with *obvious*

*clarity* to *the specific conduct* at issue." *Est. of Reat v. Rodriguez*, 824 F.3d 960,

964–65 (10th Cir. 2016) (third emphasis added) (brackets and internal quotation

marks omitted). At bottom, there must be some "substantial correspondence between

*the conduct in question* and prior law allegedly establishing that the defendant's

actions were clearly prohibited." *Id.* at 965 (emphasis added) (quotation omitted).

Here, however, nothing in the district court's abrupt second-prong analysis

indicates how it concluded that there was a sufficient connection between the

decisional law and each of the Defendants' specific conduct. The court merely noted

three categories of conduct it considered to be clearly unconstitutional. But the court

did not explain in that section to which of the Defendants it was attributing those

categories of conduct. Neither did the court link any one of those categories of

conduct to the caselaw to at all explain how (as the court concluded) "the general

constitutional rule already identified in the decisional law applies with obvious

31

clarity to the specific conduct at issue" in this case. *Id.* (citation modified). That is, the district court failed to sufficiently explain *why* the "general rule" of "a plaintiff's right to equal protection under the law is not extremely abstract or imprecise *under the facts [ ] here*, but rather is relatively straightforward and not difficult to apply." *A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191, 1199 (10th Cir. 2019) (emphasis added). As such, we cannot say that the district court carried out a full and proper "clearly established" analysis as to any of the Defendants, and we cannot be sure that the court's ultimate qualified immunity holding is adequate.

Rather than take the issues on ourselves in the first instance, we believe the prudent course is to remand the matter to the district court to perform a more complete analysis on the second qualified immunity prong. *See Distiso v. Town of Wolcott*, 352 F. App'x 478, 482 (2d Cir. 2009) (unpublished) ("When a district court gives only cursory treatment [to] the immunity defense, [we] will remand to the district court with instructions to give further consideration to the matter." (first alteration in original) (internal quotation marks omitted)). As we have previously observed, this "course bears the advantage of allowing the adversarial process to work through the problem and culminate in a considered district court decision, a decision that will minimize the risk of an improvident governing appellate decision from this court." *Kerns v. Bader*, 663 F.3d 1173, 1182 (10th Cir. 2011) (Gorsuch, J.) (vacating and remanding where district court did not reach a holding on the "clearly established" prong, but if it did, "it [wa]s simply inadequate to that task"). And this course seems especially prudent to us here, where "the briefing on appeal [is] less

32

than entirely satisfactory."[17] *Id.* Remanding will permit the parties to thoroughly brief this precise issue before the district court[18] and thereby allow the court to more fully address the second prong as to each of the Defendants before we consider those issues on appeal. *See id.*

For these reasons, we remand. The district court is to re-assess the second prong of qualified immunity with a closer eye to each of the Defendants' conduct and more thoroughly identify the correspondence between their conduct and prior law allegedly establishing that the conduct was clearly unconstitutional. We intimate no opinion about the correctness of the district court's prior second-prong conclusion, neither generally nor as to any of the Defendants. We also intimate no opinion as to whether (as the district court originally concluded) a general rule can apply with

---

[17] A good chunk of the Defendants' second-prong arguments is limited to their versions of the facts and their preferred inferences and thus is beyond our interlocutory jurisdiction. *See Duda*, 7 F.4th at 916. What purely legal, and thus jurisdictionally appropriate, arguments the Defendants manage on this prong lay out their view of our law well enough but still provide us negligible assistance with definitively answering the "clearly established" question as to each of them in this case. Likewise, Ellis's arguments in support of affirmance on this prong leave much to be desired.

[18] We also note that the second prong of qualified immunity on this claim "was barely briefed below." *See Hunt v. Montano*, 39 F.4th 1270, 1285 (10th Cir. 2022) (remanding for district court to analyze second prong of qualified immunity where court incorrectly found the prong waived). At summary judgment, second-prong arguments took up less than two pages of the Defendant's opening brief, just about one page of Ellis's response brief, and about a half of a page of the Defendants' reply. Given the lack of assistance from the parties, it is difficult to fault the district court for its curt analysis. But this underscores the need for vigorous adversarial testing of this issue in the district court to lower our chances of reaching an erroneous decision. *See Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) (Gorsuch, J.).

obvious clarity to any or all of the Defendants' conduct here, or if a case more closely aligning to the facts in this case must be identified.

**V.**

For the above reasons, we VACATE the portion of the district court's order denying qualified immunity to the Defendants on Ellis's hostile work environment claim and REMAND for further proceedings consistent with this opinion on the clearly established prong of qualified immunity, and we DISMISS this appeal for lack of appellate jurisdiction in all other respects.[19]

---

[19] We also DENY Ellis's motion for partial award of attorney fees and costs under Federal Rule of Appellate Procedure 38 for having to oppose the Defendants' arguments that we hold are beyond our interlocutory jurisdiction. Although we agree with Ellis that those arguments are unreviewable at this interlocutory posture, we do not consider the Defendants' arguments to be "wholly without merit" or the result to "have been so obvious" as to render the Defendants' arguments frivolous and sanctionable under Rule 38. *See F.D.I.C. v. McGlamery*, 74 F.3d 218, 222 (10th Cir. 1996).